## STATE v. WILLIAM JUNE MITCHELL.

172 N. W. (2d) 66.

November 7, 1969—No. 41381.

*Anderson, Bell & Chadwick* and *Earle T. Anderson, Jr.,* for appellant.

*Douglas M. Head,* Attorney General, *George M. Scott,* County Attorney, and *Henry W. McCarr, Jr.,* Assistant County Attorney, for respondent.

154

KNUTSON, CHIEF JUSTICE.

This is an appeal from a judgment entered pursuant to a jury finding of guilty on a charge of possession of narcotics.

Some of the preliminary facts pertaining to the original arrest of defendant were obtained from the record of a pretrial hearing held pursuant to State ex rel. Rasmussen v. Tahash, 272 Minn. 539, 141 N. W. (2d) 3, which was considered by the trial court as a motion for suppression of evidence.

Based on a complaint signed by one Sharon Moss, an admitted former prostitute, and information given by her to the Minneapolis Police Department, Officer James M. O'Meara of the department's morals squad obtained a warrant for the arrest of defendant, William June Mitchell, on a charge of receiving the earnings of a prostitute, contrary to Minn. St. 1965, § 617.32.[1] Armed with this warrant, and accompanied by Sharon Moss, O'Meara and several other police officers proceeded to arrest Mitchell at a residence at 1207 Morgan Avenue North in Minneapolis. O'Meara had Miss Moss call the home from a pay telephone to determine whether Mitchell was there. Upon learning that he was, they proceeded to the home. O'Meara knocked on a porch door and within a short period of time a curtain on the inside of the door was pulled back, revealing a woman later identified as Sharon Hart and defendant, who was standing in the background. O'Meara showed his badge and identified himself and stated his purpose—that he had a warrant for defendant's arrest. The curtain was closed and then opened again; O'Meara restated that it was the police. When the door was not opened, the officers forced it open and found Miss Hart and defendant standing immediately inside, in an entry-living room

---

[1] § 617.32, subd. 1, read: "It shall be unlawful for any person to knowingly accept or receive, in whole or in part, his or her support or maintenance from the proceeds or earnings of any woman engaged in prostitution." This section was repealed by L. 1967, c. 507, which enacted substantially the same provision as § 609.32, subd. 4, part of the Criminal Code.

area. Defendant thereupon was placed under arrest and hand-cuffed. The complaint was read to him and he was given a "Miranda" warning.

O'Meara had received from Miss Moss a description of the house and a diagram of the bedrooms upstairs. He testified at the "Rasmussen" hearing that she had told him the layout of the bedrooms; that she resided in the front bedroom and that "William June Mitchell also resided or used that bedroom, slept in that bedroom. * * * She said that his clothing was in another closet in the room. She said she had her other personal effects, perfumes and all of her personal items, there."

At the time defendant was placed under arrest O'Meara informed him that he was going to search the bedroom of Sharon Moss upstairs. He testified that defendant replied, "Go ahead, it's her house," but that thereafter "he said it was his house, and then he said it was her bedroom and then he said it was his bedroom." According to O'Meara, the last thing that defendant said was that it was his house and his bedroom. In any event, O'Meara went upstairs, and as he approached the doorway of the front bedroom he observed a small stand next to a bed. On the stand he saw a lamp, which was turned on, and a small tray with an object on it which he "thought was a reefer." (A reefer was described as a marijuana hand-rolled cigarette.) Upon seeing the "reefer" he called the police department and requested a member of the narcotics unit to join him. Officer Gaylord G. Gladwin reached the house in 10 to 15 minutes. He examined the "reefer" and concluded that it was marijuana, whereupon defendant was taken upstairs and placed under arrest for "investigation of narcotics." Following this arrest the officers proceeded to search the room. In the pocket of a sport coat found in the front bedroom the police discovered a small manila envelope containing a substance which they suspected was marijuana. Chemical analysis of both the "reefer" and the substance found in the sport coat confirmed their suspicions.

Upon being questioned, defendant admitted that he owned the

bed, the nightstand, and several other objects in the bedroom, but said he did not own a television set, which he said belonged to a third girl.

At the Rasmussen hearing O'Meara did not recall whether defendant answered a question as to whether the reefer was his, but at the trial O'Meara's testimony indicated that defendant denied knowledge of it.

At the time the police entered the house defendant was dressed in a suit. Miss Hart was dressed in pajamas and a duster-type housecoat. Both were taken to the police station and, after being booked, defendant was disrobed and it was found that underneath his suit he was clothed in pajamas.

At the Rasmussen hearing the trial court held that the marijuana and other items seized by the police were admissible at trial. At the trial itself, the fact that the police approached and entered the house pursuant to an arrest warrant was disclosed, but the nature of the charge in the original warrant was not disclosed to the jury.

Considerable evidence was adduced with respect to the ownership of the house. It appeared that defendant had purchased the house in his name on a contract for deed from a realtor, who had also sold him a house on Queen Avenue North. Miss Moss, who had had a change of heart by the time of the trial, testified for defendant. She claimed that the house on Morgan Avenue was bought in defendant's name for her because she was not yet 21 years of age at that time. Defendant did not testify. There was evidence that defendant's doctor had treated him 15 to 20 times at the Queen Avenue address but had never treated him at the Morgan Avenue place. Defendant also had a brother who sometimes stayed at the Morgan Avenue house. Evidence was found consisting of letters and postcards addressed to defendant at the Morgan Avenue address. It appeared that utility bills for the house were in the name of Miss Moss.

The state called as a rebuttal witness a member of the morals squad who had previously been a patrolman at the North Side

Precinct. He testified to seeing defendant at the Morgan Avenue address on three occasions. On one occasion he had attempted to serve a subpoena on Sharon Hart, and defendant had answered the door clad in pajamas. On another occasion he had gone to investigate a burglary at that address and found defendant and Miss Moss there. Defendant informed him that his house had been burglarized and rifles and shotguns had been taken. On the third occasion, when the officer was in a squad car parked in front of the house, defendant had come out, clad in pajamas and robe, and taken down the license number of the car.

Defendant was convicted by the jury of unlawful possession of narcotics. He raises three questions on this appeal: (1) Was the evidence seized the product of an illegal search and seizure? (2) Did probable cause exist for a warrantless arrest of defendant on the narcotics charge? (3) Was the evidence sufficient to justify a verdict of guilty?

At the outset, it is apparent that the original arrest upon a warrant for receiving the earnings of a prostitute was legal. The question then arises, was it thereupon legal for the officers to search the house for evidence relating to that crime? And, if so, when as a result of that search they discovered the "reefer" in plain sight, was the arrest of defendant for possession of narcotics and the subsequent search of the room and seizure of evidence relating to that crime lawful?

The state argues that inasmuch as the officers were lawfully on the premises by virtue of the warrant for the arrest of the defendant for accepting the earnings of a prostitute they had a right to search the upstairs bedroom without a warrant; and when they saw the reefer in plain sight they had a right to arrest defendant for possession of narcotics and make an additional search as incident to that arrest.

There are many weaknesses in the state's position. In the first place, the officers did not arrest defendant for possession of narcotics. They pretended to arrest him for "investigation of narcotics." We know of no such crime as that. But even if they

had arrested him for the possession of narcotics, there was no reason why they could not obtain a search warrant if they had wished to go further in seeking evidence of that crime.

The state next contends that the defendant consented to a search of the house involved. It is difficult to find a consent under the facts in this case in the light of recent decisions of the Supreme Court of the United States. In Bumper v. North Carolina, 391 U. S. 543, 88 S. Ct. 1788, 20 L. ed. (2d) 797, the defendant was tried for the crime of rape. Among the items of evidence introduced by the prosecution was a .22-caliber rifle allegedly used in the commission of the crime. The defendant lived with his grandmother in a house located in a rural area. Two days after the alleged offense, but prior to petitioner's arrest, four law-enforcement officers went to the house and found the grandmother there with some young children. One of the officers announced, "I have a search warrant to search your house." The grandmother responded, "Go ahead," and opened the door. As a result of the search the officers found the rifle, which was later introduced in evidence.

As here, it was contended that the officers had consent to search the house. This contention was rejected by the court, which said (391 U. S. 548, 88 S. Ct. 1792, 20 L. ed. [2d] 802):

"When a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority. A search conducted in reliance upon a warrant cannot later be justified on the basis of consent if it turns out that the warrant was invalid. The result can be no different when it turns out that the State does not even attempt to rely upon the validity of the warrant, or fails to show that there was, in fact, any warrant at all.

"When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with

coercion—albeit colorably lawful coercion. Where there is coercion there cannot be consent."

Much the same is true here. The officers did not ask permission to search the house. After defendant had been arrested and handcuffed, they announced their intention to search the house. At the most, defendant said, "Go ahead, it's her house." But this, under these circumstances, can hardly be considered a consent freely and voluntarily given. If he had denied the officers the right to search, it is doubtful that they would have refrained from proceeding.

In any event, the facts here belie any consent to search for narcotics. Even if we construe what occurred as a consent to search for evidence of the crime for which defendant had been arrested, there is nothing to show a consent to search for narcotics, which was done some time after the so-called consent had been given and after sufficient time had elapsed to permit the officers to obtain a search warrant.

In the case of United States v. Marrese (3 Cir.) 336 F. (2d) 501, a companion of the defendant was arrested on the first floor of a rooming house for deserting from the United States Marine Corps. One officer claimed that he asked defendant if he could search the second-floor room occupied by defendant and his companion, and that defendant said to "go right ahead." The Federal court rejected this as consent, saying (336 F. [2d] 504) it falls within "what the military euphoniously term 'evasive action' when resorting to retirement of their forces to avoid confrontation with the enemy." The court also held that the search of the second-floor room was not incident to an arrest.

Apparently the right to search as an incident to an arrest is justified by the need to seek weapons and other things that might be used to assault an officer or to effect an escape, and by the need to prevent destruction of evidence. Here neither element is present. Defendant was already arrested and handcuffed; and, with the number of officers present, there was no likelihood that he could get to the second floor to obtain weapons nor any likeli-

hood that he could have destroyed evidence. The police were in possession of the premises and if they desired to search for narcotics they could easily have obtained a search warrant when they called a narcotics officer to come to the premises.

The state relies heavily upon Harris v. United States, 331 U. S. 145, 67 S. Ct. 1098, 91 L. ed. 1399, and United States v. Rabinowitz, 339 U. S. 56, 70 S. Ct. 430, 94 L. ed. 653. In Harris the search was of a four-room apartment, and in Rabinowitz the search was of a one-room office. At the time of the trial in this case it is arguable that Harris and Rabinowitz might have been authority for a search as extensive as that involved here. Both, as applied to the issue now involved, were overruled by Chimel v. California, 395 U. S. 752, 89 S. Ct. 2034, 23 L. ed. (2d) 685.

In Chimel, three police officers arrived at the home of defendant in the late afternoon with a warrant authorizing his arrest for the burglary of a coin shop. The officers knocked on the door, identified themselves to defendant's wife, and asked if they could come inside. She ushered them into the house, where they waited 10 or 15 minutes until defendant came home from work. When he entered, one of the officers handed him the arrest warrant and asked for permission to "look around." Defendant objected but was advised that on the basis of "lawful arrest" the officers would conduct a search. No search warrant had been issued.

Accompanied by defendant's wife the officers looked through the three-bedroom house, including the attic, the garage, and a small workshop. In the master bedroom and sewing room they directed defendant's wife to open drawers, and after completing their search they seized numerous items—primarily coins, but also several medals, tokens, and a few other objects.

The California court held that the search was lawful as incident to a lawful arrest. People v. Chimel, 68 Cal. (2d) 436, 67 Cal. Rptr. 421, 439 P. (2d) 333. After reviewing its fluctuating decisions on the issue of the validity of searches incident to ar-

rest, the Supreme Court said (395 U. S. 762, 89 S. Ct. 2040, 23 L. ed. [2d] 694):

"* * * When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. And the area into which an arrestee might reach in order to grab a weapon or evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

"There is no comparable justification, however, for routinely searching rooms other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself. Such searches, in the absence of well-recognized exceptions, may be made only under the authority of a search warrant. The 'adherence to judicial processes' mandated by the Fourth Amendment requires no less.

* * * * *

"It would be possible, of course, to draw a line between Rabinowitz and Harris on the one hand, and this case on the other. For Rabinowitz involved a single room, and Harris a four-room apartment, while in the case before us an entire house was searched. But such a distinction would be highly artificial. The rationale that allowed the searches and seizures in Rabinowitz and Harris would allow the searches and seizures in this case.

No consideration relevant to the Fourth Amendment suggests any point of rational limitation, once the search is allowed to go beyond the area from which the person arrested might obtain weapons or evidentiary items. The only reasoned distinction is one between a search of the person arrested and the area within his reach on the one hand, and more extensive searches on the other.

\* \* \* \* \*

"Rabinowitz and Harris have been the subject of critical commentary for many years, and have been relied upon less and less in our own decisions. It is time, for the reasons we have stated, to hold that on their own facts, and insofar as the principles they stand for are inconsistent with those that we have endorsed today, they are no longer to be followed."

Whether Chimel is to be applied retroactively is difficult to determine. The Supreme Court in two cases decided the same day as Chimel refused to pass on the question. In Von Cleef v. New Jersey, 395 U. S. 814, 89 S. Ct. 2051, 23 L. ed. (2d) 728, the defendant was arrested on the third floor of a 16-room house in which she and another lived. No search warrant had been issued. Several policemen proceeded to search the entire house for about three hours, eventually seizing several thousand articles. A motion to suppress was denied by the trial court and defendant's conviction was subsequently affirmed by the Superior Court. State v. Von Cleef, 102 N. J. Super. 102, 245 A. (2d) 495. Following denial of review by the New Jersey Supreme Court, Id. 52 N. J. 499, 246 A. (2d) 456, the United States Supreme Court reversed the conviction, saying (395 U. S. 815, 89 S. Ct. 2052, 23 L. ed. [2d] 730):

"The petitioners attack the New Jersey courts' conclusion that the search and seizures described above were constitutionally permissible as being incident to a valid arrest. This conclusion would unquestionably be well founded if today's decision in Chimel v. California, ante, p. 752, were given retroactive applica-

tion. But we need not decide here whether Chimel should be applied retroactively. For even under the constitutional standards prevailing before Chimel, see United States v. Rabinowitz, 339 U. S. 56; Harris v. United States, 331 U. S. 145, the search and seizures involved here were constitutionally invalid."[2]

Mr. Justice Harlan, in a separate concurring opinion, would have held that Chimel was retroactive.

In Shipley v. California, 395 U. S. 818, 89 S. Ct. 2053, 23 L. ed. (2d) 732, police officers went to defendant's residence. He was not at home, but a 15-year-old girl who identified herself as defendant's wife allowed the officers to enter and search her belongings. Several items taken in a robbery were found and the officers "staked out" the house and awaited defendant's return. When he arrived he was arrested. The officers searched him and his car and again entered and searched the house, where they discovered another item stolen in the robbery. The court below upheld the search on the grounds that it was incident to an arrest, holding that the area searched was "under the [petitioner's] effective control" at the time of the arrest.

In reversing, the United States Supreme Court said (395 U. S. 819, 89 S. Ct. 2054, 23 L. ed. [2d] 734):

"Under our decision today in Chimel v. California, *ante,* p. 752, the search clearly exceeded Fourth Amendment limitations on searches incident to arrest. But even if Chimel were to have no retroactive application—a question which we reserve for a case which requires its resolution—there is no precedent of this Court that justifies the search in this case. The Court has consistently held that a search 'can be incident to an arrest only if it is substantially contemporaneous with the arrest and is confined to the *immediate* vicinity of the arrest.' Stoner v. California, 376 U. S. 483, 486. (Emphasis supplied.)"

In a dissenting opinion, Mr. Justice White points to other cases

---

[2] The court does not mention the fact that Harris and Rabinowitz were overruled, at least in part, by Chimel.

in which the opinions of the court are difficult to reconcile with these decisions. About all that can be said at this time is that whether or not Chimel will finally be held to be retroactive by the United States Supreme Court is in a state of hopeless confusion. This uncertainty leaves all state courts in the unenviable position of having to guess at what the decision will ultimately be. If a question of this kind could be answered when the decision is issued, we think the state courts could live with it no matter how much we might disagree. It is the uncertainty of future decisions that makes our work unpleasant.

Four courts seemingly have passed on this question. Three, United States v. Bennett (2 Cir.), 415 F. (2d) 1113; People ex rel. Muhammad v. Mancusi (S. D. N.Y.) 301 F. Supp. 1100; and People v. Castillo (Cal. App.) 80 Cal. Rptr. 211, held Chimel should not be applied retroactively. The other, State v. Rhodes, 80 N. Mex. 729, 460 P. (2d) 259, apparently held the opposite. We would be inclined to follow those holding it should not be applied retroactively, if we must decide the question, but in the case now before us we think the search extended too far even under the rules existing prior to Chimel.

So far as we can determine from the record, no attempt was made to search for evidence relating to the crime for which defendant was originally arrested. In examining the record, the suspicion lurks that the original arrest was intended only as a ruse for gaining lawful entry into the house to enable the officers to search for evidence of other crimes without a warrant. If a search was to be made for evidence of narcotics, we see no reason why a search warrant could not have been obtained if probable cause could be established. Under these facts we think that, even if Chimel is not retroactive, the search was in violation of defendant's constitutional rights and the evidence should have been suppressed. As has been mentioned, there was no reason a search warrant could not have been obtained when the officers decided to search for narcotics. There was no possibility of

destruction of evidence, as the police were in control of the premises.

Moreover, the evidence upon which conviction rests is far from convincing. The coat in which marijuana was found was never directly connected with the defendant. It is true there is evidence that defendant occupied the room in which the "reefer" was first discovered and in which the coat containing additional marijuana was found, but others also occupied this room; and it seems that the minimum that would have been required was to show that the coat actually belonged to the defendant.

In view of the questionable validity of the search for narcotics, the unsatisfactory nature of the evidence, and the severity of the sentence imposed, we think there should be a new trial. It is doubtful that a conviction can be had without use of the evidence seized, but the state may have other evidence upon which a conviction can rest.

Finally, defendant contends that the Miranda warning was not given prior to interrogation relating to the second arrest. It is conceded that such warning was given prior to interrogation after the first arrest. The two occurrences were separated by not more than 15 minutes. It would have been a useless formality to repeat the warning. In the absence of some showing to the contrary, it must be assumed that over that short interval of time the defendant could remember the warning that had been given him. The purpose of the warning is to apprise defendant of his rights. In People v. Hill, 39 Ill. (2d) 125, 131, 233 N. E. (2d) 367, 371, the Illinois court answered a similar claim in the following way:

"It should be made clear that once Miranda's mandate was complied with at the threshold of the questioning it was not necessary to repeat the warnings at the beginning of each successive interview. To adopt an automatic second-warning system would be to add a perfunctory ritual to police procedures rather

than providing the meaningful set of procedural safeguards envisioned by Miranda."

See, also, Gorman v. United States (1 Cir.) 380 F. (2d) 158. Reversed.