**STATE of Minnesota,
Petitioner, Appellant,**

v.

**Edward Charles RODEWALD,
Respondent.**

**No. C0–85–700.**

Supreme Court of Minnesota.

Nov. 8, 1985.

Steven H. Alpert, Rice Co. Atty., Faribault, Paul R. Kempainen, Sp. Asst. Atty. Gen., St. Paul, for appellant.

David Hvistendahl, Northfield, for respondent.

AMDAHL, Chief Justice.

The issue in this case is whether the police violated defendant's fourth amendment rights in searching his wallet as part of a search following his arrest on a bench warrant issued after he failed to appear in a family court matter. The search of the wallet resulted in the discovery of a so-called "acid blotter," which is a blotter soaked with acid, in this case L.S.D., that can be chewed and swallowed. Defendant was thereafter charged with possession of L.S.D. The Court of Appeals affirmed the trial court's order granting defendant's motion to suppress the evidence and dismiss the prosecution. *State v. Rodewald*, 372 N.W.2d 824 (Minn.App.1985). We granted the state's petition for review. *State v. Rodewald*, (Minn., filed October 11, 1985). Holding that the police did not violate defendant's fourth amendment rights, we reverse and remand for trial.

Officer Richard R. Larson of the Faribault Police Department, who was aware that there was an outstanding bench warrant for defendant's arrest for failure to appear in a family court matter, spotted defendant driving a motorcycle with extremely high handlebars, a violation of the laws regulating motorcycles. After stopping and identifying defendant and verifying that the warrant was still outstanding, he placed defendant under arrest

and frisked him before placing him in the squad car. The frisk resulted in the discovery of a locked-blade knife. At the jail, as part of the booking process, Officer Larson assisted the jailer by conducting a jailhouse or inventory search of defendant's person. While looking through defendant's wallet he found, mixed in with miscellaneous cards and papers, the acid blotter, which he recognized based on his training and experience.

At the omnibus hearing defense counsel elicited testimony from Officer Larson that in going through the wallet he looked at and read or "scanned" each of defendant's various motorcycle club membership cards, with the intent of complying with a general request from someone at the Minnesota Bureau of Criminal Apprehension that he report anything he learned in the course of his duties about area motorcycle club memberships. Larson testified, however, that he was not discriminating against defendant, that the jailhouse search was standard procedure and that he always carefully looked through the wallets of arrestees when he conducted inventory searches. He testified that the acid blotter was substantially different in appearance from the other cards, both in size (it was only ½ inch by ½ inch) and material (it was thicker and more absorbent) and that it was immediately apparent to him that it probably was an illegal acid blotter. Larson could not remember if he prepared an inventory of the items taken from defendant for safekeeping but testified that either the jailer or he did.

The jailer, Deputy Charles D. Aldorfer, testified that it is written jail policy to conduct a search of every person who is jailed after being arrested and that the standard search includes a search of personal effects, including wallets. He testified that he normally conducts the search unless the arresting officer does it for him. He testified that if Larson had not searched defendant's wallet, he would have and that he would have scanned the cards as he looked through the wallet. He testified also that he was familiar with acid blotters. He testified that an inventory

form is filled out for every inmate from whom property is taken but that he was not sure whether it was he or Officer Larson who did it in this case. He testified that he would not have individually listed each item in the billfold—that, e.g., he would have written down "miscellaneous papers" for ordinary identification cards.

The trial court concluded that although it was proper to seize the wallet, it was improper to search it either as an incident of the arrest or for the purpose of inventorying its contents. The trial court reasoned that the search of the wallet was an unjustified exploratory search for contraband and information concerning motorcycle club memberships.

The Court of Appeals ruled that (1) the search of the wallet was not justified as a search incident to arrest, (2) the search was not a valid inventory search, and (3) there was no basis for concluding that the blotter inevitably would have been discovered by a lawful inventory search by the jailer not involving close scrutiny of cards and papers. 372 N.W.2d at 826–28.

■ 1. The Court of Appeals reasoned that the search was not justified as a search incident to arrest because the search took place at the station house rather than at the scene of the arrest and because the search was unneeded.

In attaching significance to the fact that the search occurred at the station house rather than at the scene of the arrest, the Court of Appeals relied on *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), and *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). *Belton* held that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile." 453 U.S. at 460, 101 S.Ct. at 2864 (footnotes omitted). The Court of Appeals concluded from this language that the case supported a general requirement that an incidental search of the person of an arrestee be

made at the time of the arrest and not delayed until the arrestee is at the station. That this is not so is made clear by *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), a case upholding the seizure of an arrestee's clothing from him in the jail the morning after his arrest. There the Court stated:

> [O]nce the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other. This is true where the clothing or effects are immediately seized upon arrival at the jail, held under the defendant's name in the "property room" of the jail, and at a later time searched and taken for use at the subsequent criminal trial. The result is the same where the property is not physically taken from the defendant until sometime after his incarceration.

415 U.S. at 807–08, 94 S.Ct. at 1239 (footnotes omitted). To the same effect, *see State v. Riley*, 303 Minn. 251, 226 N.W.2d 907 (1975), and *State v. Scroggins*, 297 Minn. 144, 210 N.W.2d 55 (1973).

*United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), is also inapplicable. It held that once law enforcement officers have reduced to their control luggage and other closed containers not immediately associated with the person arrested, a delay of an hour or so after the arrest destroys any justification for searching the container as an incident of the arrest. *Id.* at 15, 97 S.Ct. at 2485. A wallet is not akin to the container in *Chadwick* since it is immediately associated with the person of the arrestee. As Professor LaFave points out, courts have "consistently" taken the position that "on incident-to-arrest grounds * * * at the station the police may search through the arrestee's pockets, wallet [and] other containers on the person * * * and may seize incrimina-

ting objects thereby revealed." 2 W. La-Fave, Search and Seizure § 5.3 at 304–05 (1978). *See, e.g., United States v. Castro*, 596 F.2d 674 (5th Cir.), *cert. denied*, 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979) (upholding search of wallet and papers found within at station house search incident to arrest); *see also State v. Frazier*, 318 N.W.2d 42 (Minn.1982) (stating that search of woman's purse and wallet would have been justified as search incident to arrest if arrest had been valid, which it was not); *State v. Scroggins*, 297 Minn. 144, 210 N.W.2d 55 (1973) (upholding, as search incident to arrest, search at police station of pockets and of billfold of defendant arrested for disorderly conduct).

The Court of Appeals also concluded that the search could not be justified as an incident of the arrest because it was unneeded. Specifically, the court pointed to the lack of need "to disarm [defendant] or prevent the destruction of evidence." 372 N.W.2d at 828. In concluding that this lack of need meant that the search was not valid as a search incident to arrest, the court relied on a statement of Justice Marshall in his concurring opinion in *Illinois v. Lafayette*, 462 U.S. 640, 649, 103 S.Ct. 2605, 2611, 77 L.Ed.2d 65 (1983), where he said that he agreed that the search in that case was a valid inventory search but that it would not have been justified as a search incident to arrest because "[a] warrantless search incident to arrest must be justified by a need to remove weapons or prevent the destruction of evidence." This one-sentence summary of the justification for a search incident to arrest is not an accurate summary of the law but instead is a summary of Justice Marshall's opinion of what the law should be; in fact, in support of it he cites his own dissenting opinion in *United States v. Robinson*, 414 U.S. 218, 251, 94 S.Ct. 467, 484, 38 L.Ed.2d 427 (1973). An examination of the majority opinion in *Robinson* makes it clear that the court there adopted a "bright line" rule allowing a search incident to a custodial arrest whenever such an arrest is made, regardless of whether the officer can articulate

any need in that case for such a search. Specifically, the Court in *Robinson* stated:

A police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick *ad hoc* judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search. The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend upon what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search
\* \* \*.

414 U.S. at 235, 94 S.Ct. at 477.

2. The Court of Appeals' analysis of the issue of whether the search was justified as an inventory search is also erroneous. The court ruled that the search was not a valid inventory search because Officer Larson had an exploratory motive and because close scrutiny of personal papers is beyond the scope of an inventory search.

The leading case dealing with inventory searches made in connection with the jailing of arrestees is *Illinois v. Lafayette*, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983). In that case the police conducted an inventory search of the shoulder bag of a person jailed after being arrested for disturbing the peace and they found drugs in the bag. The defendant argued that the bag should have been sealed as a unit without being examined. The Court held that whenever an arrestee is to be jailed, the police, as part of a standarized procedure, may examine "all of the items removed from the arrestee's person or possession \* \* \*." 462 U.S. at 646, 103 S.Ct. at 2609. The Court stated:

At the station house, it is entirely proper for police to remove and list or inventory property found on the person or in the possession of an arrested person who is to be jailed. A range of governmental interests supports an inventory process. It is not unheard of for persons employed in police activities to steal property taken from arrested persons; similarly, arrested persons have been known to make false claims regarding what was taken from their possession at the station house. A standardized procedure for making a list or inventory as soon as reasonable after reaching the station house not only deters false claims but also inhibits theft or careless handling of articles taken from the arrested person. Arrested persons have also been known to injure themselves—or others—with belts, knives, drugs, or other items on their person while being detained. Dangerous instrumentalities—such as razors blades, bombs, or weapons—can be concealed in innocent-looking articles taken from the arrestee's possession. The bare recital of these mundane realities justifies reasonable measures by police to limit these risks—either while the items are in police possession or at the time they are returned to the arrestee upon his release. Examining all the items removed from the arrestee's person or possession and listing or inventorying them is an entirely reasonable administrative procedure. It is immaterial whether the police actually fear any particular package or container; the need to protect against such risks arises independently of a particular officer's subjective concerns. [Citation omitted.] Finally, inspection of an arrestee's personal property may assist the police in ascertaining or verifying his identity. [Citation omitted.] In short, every consideration of orderly police administration benefiting both police and the public points toward the appropriateness of the examination of respondent's shoulder bag prior to his incarceration.

\*　　\*　　\*　　\*　　\*　　\*

Even if less intrusive means existed of protecting some particular types of property, it would be unreasonable to expect police officers in the everyday course of business to make fine and subtle distinctions in deciding which containers or items may be searched and which must be sealed as a unit.

\* \* \* \* \* \*

[W]e hold that it is not "unreasonable" for police, as part of the routine procedure incident to incarcerating an arrested person, to search any container or article in his possession, in accordance with established inventory procedures.

462 U.S. at 646–48, 103 S.Ct. at 2609–11. *Lafayette* thus permits the routine examination of the wallet as part of an inventory search of an arrestee being jailed.

 In an earlier case, *South Dakota v. Opperman*, 428 U.S. 364, 376, 96 S.Ct. 3092, 3100, 49 L.Ed.2d 1000 (1976), the Court, in upholding an inventory search of an impounded automobile, stated in passing, "[T]here is no suggestion whatever that this standard procedure, essentially like that followed throughout the country, was a pretext concealing an investigatory police motive." Relying on this language and on the testimony of Officer Larson that he was looking for drugs and for information as to defendant's membership in motorcycle clubs, the Court of Appeals concluded that the search was an invalid exploratory search. We believe that the Court of Appeals misinterpreted the statement from *Opperman*—which, incidentally, is not quoted in *Lafayette*—as suggesting that it is relevant in cases such as this to inquire into the motives of the officer conducting the search. The case of *Scott v. United States*, 436 U.S. 128, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978)—decided after *Opperman* but before *Lafayette*—strongly supports the view that such an inquiry is not proper. *Scott*, which we have relied on in numerous cases, stands for the proposition that "a search must be upheld, at least as a matter of federal constitutional law, if there was a valid ground for the search, even if the officers conducting the search based the search on the wrong ground or had an improper motive." *State v. Pleas*, 329 N.W.2d 329, 332 (Minn.1983). As Professor LaFave interprets *Scott* and applies it in this context, courts may inquire under the language of *Opperman* into whether the inventory search was carried out in accordance with standard procedures in the local police department, but if the search was carried out in accordance with those procedures it makes no difference whether the officer had an ulterior motive or expected to discover evidence. 1 W. LaFave, Search and Seizure § 1.2(g) at 43–54, particularly at 54 (Supp.1985). *See United States v. Griffin*, 729 F.2d 475, 485 (7th Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984) (officer's suspicion of bag's contents does not invalidate inventory search of bag). In this case, the fact that Officer Larson was looking for drugs and information when he examined the wallet does not mean that the search of it was not a legal inventory search. Whether the search of the wallet was a legal inventory search depends on whether the search was carried out in accordance with the department's standard procedures for inventory searches. It is clear from the testimony of both Officer Larson and Deputy Aldorfer that the search was carried out in accordance with standard procedures.

 The Court of Appeals also reasoned that close scrutiny of personal papers is beyond the scope of an inventory search. Justice Powell, in his concurring opinion in *South Dakota v. Opperman*, 428 U.S. 364, 380 n.7, 96 S.Ct. 3092, 3102 n.7, 49 L.Ed.2d 1000 (1976), stated his opinion that the authority to carry out a standard inventory search of an automobile does not carry with it the general authority to examine the contents of all private papers found in the search. For a discussion of the issue of the likelihood that the United States Supreme Court will hold that some papers—*e.g.*, diaries—are so personal and private as to require more protection than that given other items, *see* 1 W. LaFave, Search and Seizure § 2.6(e) (1978). We dis-

**422**

cussed how the issue can arise and summarized some of the different approaches of other courts in *State v. Kindem,* 338 N.W.2d 9, 14–15 (Minn.1983), *cert. denied,* — U.S. ——, 104 S.Ct. 2352, 80 L.Ed.2d 825 (1984), but we concluded that we did not need to decide the legality of the search and the seizure of the papers in that case. More recently, in *State v. Carr,* 361 N.W.2d 397, 400 (Minn.1985), we stated that "magistrates and reviewing courts should closely scrutinize warrants so that they do not loosely authorize seizure of private papers." In this case, there is no need to decide whether the officer acted illegally in reading the cards for their informational content because it is clear in any event that he could have (under *Lafayette*) and would have examined each of the cards in the wallet at least to determine if they were valuable and if they had to be individually listed and in trying to determine if the wallet contained any contraband; it is also clear that he would have found the acid blotter in so doing. Stated differently, while any illegality in reading the cards might have justified suppression of the cards and their contents, if the state wanted to use them as evidence of something, it does not justify suppression of the acid blotter where the record indicates that the blotter would have been discovered by the officer even if he had limited his examination of the contents of the wallet in such a way as not to actually read the cards. *See State v. Milliman,* 346 N.W.2d 128, 130 (Minn.1984) (overintrusive search does not require suppression of items which would have been discovered even if the search had not been overintrusive).

■ 3. For the same reason, we believe that the Court of Appeals erred in its analysis of the issue of whether the evidence inevitably would have been discovered lawfully by Deputy Aldorfer. It is clear from the record that Deputy Aldorfer could have and would have examined the contents of the wallet if Officer Larson had not done so and that he would have recognized the acid blotter for what it was and seized it. *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *State v. Ep-*

*pler,* 362 N.W.2d 315 (Minn.1985); *State v. Seefeldt,* 292 N.W.2d 558 (Minn.1980).

Reversed and remanded for trial.

PETERSON, J., took no part in the consideration or decision of this case.