**STATE of Minnesota, Respondent,**

**v.**

**Joseph D. TURE, Appellant.**

**No. C8–00–798.**

Supreme Court of Minnesota.

Aug. 16, 2001.

Mark D. Nyvold, for appellant.

Mike Hatch, Attorney General, Thomas R. Razatz, Assistant Attorney General, Roger S. Van Heel, Stearns County Attorney, for respondent.

## OPINION

PAGE, Justice.

Appellant Joseph Ture was convicted in January 2000 of four counts of first-degree murder in violation of Minn.Stat. § 609.185, subd. 1 (1978), for the December 15, 1978, murders of Alice Huling and three of her four children. Ture was sentenced to four consecutive life sentences.

In this direct appeal, Ture argues that the district court erred when it denied his motion at trial to suppress three items seized from his car four days after the murders: a metal bar wrapped in what appeared to be a steering wheel cover, a two-inch Corgi Juniors Batmobile toy car, and a ski mask. Ture also claims that the court erred in finding that the police properly retained those items until his trial in this case. In addition, Ture argues that he was denied a fair trial by evidentiary rulings that (1) permitted the state to introduce evidence that the seized toy car was similar to a toy that may have been present at the murder scene and (2) allowed the state to present expert testimony that a bruise on Alice Huling was caused by the metal bar seized from Ture's car. Ture also raises various pro se issues. We affirm.

During the early morning hours of December 15, 1978, Alice Huling and three of her four children were murdered in their house located in rural Stearns County. The surviving child, William Huling, was 11 years old at the time and was the only witness to the murders. At trial, William testified that he was asleep in the upstairs bedroom he shared with his 13–year–old brother, Wayne, when at approximately 4:00 a.m. he was awakened by loud noises coming from the kitchen below. He heard muffled noises and wrestling, and then a gunshot. A short while later, he heard footsteps coming up the stairs and saw a person standing in the doorway to the bedroom. The person appeared to be of medium build, less than six feet tall, and wearing a stocking cap. William could see a silhouette of the person's face, but not well enough to make a positive identification. From his bed, Wayne asked, "Who are you?" The person fired a shotgun at Wayne, killing him instantly. The person then left the boys' room and went to 16–year–old Susie's bedroom where he shot

her in the head, and proceeded to 12–year-old Patti's bedroom where he shot her in the head. Both girls died instantly. After shooting both girls, the gunman returned to the boys' room and fired twice at William, missing both times, and then left. After 10 or 15 minutes, William got out of bed and fled to a neighbor's house.

On the morning of December 19, four days after the murders, Wright County Deputy Sheriff Gary Miller was dispatched to the restaurant at the Clearwater Travel Plaza in response to a complaint about a customer later identified as Ture. After learning that the car Ture was driving had been reported stolen, Miller arrested Ture for unauthorized use of a motor vehicle and placed Ture, handcuffed, in the back of his squad car. Upon entering Ture's car to look for its keys and a newspaper Ture indicated he wanted, Miller discovered a metal bar, approximately 32 inches in length, on the front passenger seat. Miller seized the metal bar, transported Ture to the Wright County Sheriff's Department, and arranged for Ture's car to be towed. Miller and another officer conducted an inventory search of Ture's car, during which the toy car [1] and ski mask were discovered. No weapons or ammunition were found.

Several of the items found during the search, including the toy car, the ski mask, and the metal bar discovered earlier, were turned over to Deputy James Kostreba and Detective Ross Baker of the Stearns County Sheriff's Department, who were investigating the Huling murders. Kostreba and Baker interviewed Ture on December 20, 1978. An audiotape of the interview was played to the jury at Ture's trial. During the interview, Ture said that he had been fired from his job a few days before and that he had been living out of

his car. Ture stated that the toy car belonged to him and that he had grandchildren. Ture then indicated that the toy car was for his sister's children. Ture was charged with unauthorized use of a motor vehicle and released on January 4, 1979. Although Ture was not charged with the Huling murders at that time, he remained a suspect.

In 1981, Ture was incarcerated with Toby Krominga at the Sherburne County Jail. According to Krominga, Ture confessed to murdering the Hulings and signed a written confession that Krominga had drafted according to Ture's instructions. Although the police obtained a copy of the written confession and questioned Ture on several occasions about the confession and the murders, no charges were brought against Ture. In the summer of 1998, Ture and Randall Ferguson were inmates at Minnesota Correctional Facility–Oak Park Heights. According to Ferguson, Ture confessed to the Huling murders. Ferguson informed the authorities of Ture's statements in August 1998, and in May 1999 Ture was indicted on four counts of first-degree murder in violation of Minn. Stat. § 609.185, subd. 1.

Before trial, Ture moved to suppress, among other things, the metal bar, the toy car, and the ski mask, claiming that the warrantless seizure of those items was not justified by any exception to the warrant requirement. He also claimed that the three items were improperly retained by the police from the time of their seizure until the trial in this case. During the suppression hearing, Ture testified that he found the metal bar and the toy car while working at a junkyard and that he had the ski mask because he worked outdoors at a car lot. The state argued that the metal

---

**1.** The record reflects that at the time of the murders William Huling had a toy car that was "probably identical" to the toy car found in Ture's car.

bar was properly taken during a search incident to arrest, and that the toy car and ski mask were properly taken during an inventory search or, in the alternative, during a search under the automobile exception to the warrant requirement. The district court found that the metal bar was properly seized during the search incident to Ture's arrest and, noting that there was no evidence that the inventory of Ture's car was conducted in bad faith, that the toy car and ski mask were properly seized during the inventory search. The district court also found that the three items were properly retained by the police and admissible at trial. Ture subsequently filed a motion in limine to prevent the state from introducing evidence related to the toy car. This motion was also denied.

At trial, the state offered evidence concerning Ture's confessions to Toby Krominga and Randall Ferguson. Krominga testified that, while he and Ture were incarcerated at the Sherburne County Jail in 1981, Ture admitted to committing the Huling murders. According to Krominga, Ture asked him whether someone would be considered crazy for killing a bunch of people. Ture repeated the question a few weeks later and at some point admitted to killing a family of four. Krominga stated that, over time, Ture gave him additional information, and that Ture wanted to dictate a letter for Krominga to write and send to a judge. Krominga testified that he wrote a number of drafts of the letter, to which Ture made corrections until they had a final draft. Krominga testified that he saw Ture sign the letter and that he signed it as a witness.

The four-page letter indicates that it was written by Krominga because Ture's spelling is not very good. The letter explains that Ture was angry because Alice Huling had called him a pervert when he asked her if he could go out with "Pat"

Huling, and that he broke into the Hulings' house to rape "Pat" and knock everybody out with his "billy club." The letter states that Ture shot Alice with his shotgun above the knees and hit her a couple of times because she woke up and recognized him, even though he had a ski mask on. The letter states that Ture then went upstairs and shot two girls and one boy. The letter indicates that Ture returned to Alice, told her what he had done, beat her with his fists and his "billy club," and then shot her in the head. The letter ends by stating that "this statement should prove" that he is insane. When questioned by the police, Ture denied making any confession or even discussing the Huling case with Krominga, and stated that, when he signed the alleged confession, it consisted of blank pages that Krominga told him would be used to make complaints about jail food.

Ferguson testified that in 1998, when he and Ture were inmates together at Minnesota's Oak Park Heights correctional facility, Ture admitted to Ferguson that he had "shotgunned" a family to death. According to Ferguson, Ture spoke of the surviving boy's anticipated testimony about a toy car the boy had owned that was found in Ture's car, bragging that the only way the boy could remember the toy car was if "the fear was etched into his memory so badly that he would have to live with it for the rest of his life."

At trial, the state offered the testimony of three pathologists regarding a one-inch by four-inch bruise found beneath Alice Huling's right breast during her autopsy. Dr. James Hansen conducted Alice Huling's autopsy. Dr. Hansen testified that he had compared autopsy photos of the bruise under Alice Huling's right breast with the metal bar found in Ture's car and that, in his opinion, the bar could have caused the bruise. Dr. Michael McGee, the medical examiner for Ramsey and

Washington Counties, testified that he had examined Alice's autopsy reports, photographs of the bruise, and the metal bar. Dr. McGee stated that the dimension and appearance of the bar matched the bruise. He testified that, in his opinion, either Ture's metal bar, or one of "similar configuration," caused the bruise. By "similar configuration," Dr. McGee testified that he meant a bar that "look[s] identical." Finally, Dr. Daniel Davis, a forensic pathologist with the Hennepin County Medical Examiner's Office, testified that he had also examined photographs of Alice's bruise and the metal bar. Dr. Davis testified that the bruise was a patterned injury and was unique for all practical purposes. According to Dr. Davis, the way in which the covering material was wrapped around the bar with its unique plastic lacing tied into a knot and the "unique length of the left overlacing," combined to make the arrangement, like Alice Huling's bruise, practically unique. In his testimony, Dr. Davis explained how numerous characteristics of the bruise corresponded to characteristics of the wrapping on the metal bar and concluded that, in his opinion, the metal bar caused the bruise.

In this appeal, Ture challenges the district court's denial of his motion to suppress the metal bar, toy car, and ski mask. He also claims that the court erred when it ruled that those items were properly retained until his trial in this case. He further claims that he was denied a fair trial by evidentiary rulings that allowed the state to introduce evidence about the toy car and to present expert testimony that the bruise beneath Alice Huling's right breast was caused by the metal bar. Finally, he raises various pro se issues.

## I.

We first consider whether the district court erred in finding that the police properly searched Ture's car and seized the metal bar, the toy car, and the ski mask, and did not improperly retain those items. When the facts are undisputed, this court reviews *de novo* a district court's denial of a motion to suppress. *State v. Carter,* 569 N.W.2d 169, 173 (Minn.1997). In this case, there are no disputed facts surrounding the search of Ture's car, the seizure of the three items in question, or their retention by the police. Accordingly, we give no deference to the district court's decision to deny Ture's motion to suppress these items.

Both the United States and Minnesota Constitutions prohibit the state from conducting unreasonable searches or seizures. U.S. Const. amend. IV; Minn. Const. Art. I, § 10; *State v. Munson,* 594 N.W.2d 128, 135 (Minn.1999). In general, searches conducted without a search warrant are "per se unreasonable." *Munson,* 594 N.W.2d at 135. In this case, the police did not have a search warrant authorizing a search of Ture's car. Therefore, unless "one of the well-delineated exceptions to the warrant requirement" applies, the seizure of the three items from his car was unconstitutional. *Id.* The state bears the burden of establishing an exception to the warrant requirement. *See State v. Fitzgerald,* 562 N.W.2d 288, 288 (Minn.1997) (state bears the burden of establishing the existence of an emergency justifying a warrantless entry under the emergency exception to the warrant requirement); *State v. Mastrian,* 285 Minn. 51, 56, 171 N.W.2d 695, 699 (1969) (upon challenge to a warrantless arrest, state has the burden of proving that the arrest did not violate the Fourth Amendment).

With respect to the metal bar, the state contends that the exception for searches incident to arrest applies. With respect to the toy car and ski mask, the state argues that the exception for invento-

ry searches applies. Under the exception for searches incident to arrest, once a vehicle's occupant is lawfully arrested the police may search the vehicle's passenger compartment. *New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981); *State v. Robb*, 605 N.W.2d 96, 100 (Minn.2000). The inventory exception, in turn, permits the police to search a vehicle provided they (1) follow standard procedures in carrying out the search and (2) perform the search, at least in part, for the purpose of obtaining an inventory and not for the sole purpose of investigation. *State v. Holmes*, 569 N.W.2d 181, 188 (Minn.1997).

## Search Incident to Arrest

The state argues that the metal bar was properly seized during a search incident to Ture's arrest. Ture concedes that the police may conduct such searches without violating the Fourth Amendment, but nevertheless argues that probable cause is required to "seiz[e] specific items of property pursuant to such a search" and that the metal bar was improperly seized from his car because it did not have any "immediately apparent evidentiary value."

Ture misconstrues the nature of a search incident to arrest, which is directed not only at preventing the destruction of evidence, but also at removing any weapons the arrestee might use to resist arrest or flee. *State v. Mitchell*, 285 Minn. 153, 161, 172 N.W.2d 66, 71 (1969); *see also State v. Rodewald*, 376 N.W.2d 416, 420 (Minn.1985). Accordingly, the metal bar need not have had "immediately apparent evidentiary value." Because the metal bar could have been used as a weapon, we conclude that its seizure was proper as part of the search of Ture's car incident to his arrest.

## Inventory Search

When performing inventory searches, the police fulfill "administrative or caretaking functions" that protect the vehicle owner's property and also protect the police from claims of lost or damaged property. *Holmes*, 569 N.W.2d at 186. The requirement of particularized inventory procedures is designed to make sure the intrusion is no greater than necessary to execute this "caretaking function." *Id.* at 187 (quoting *South Dakota v. Opperman*, 428 U.S. 364, 375, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976)).

Ture acknowledges that Miller testified that the inventory was conducted according to Wright County Sheriff's Department policy, but argues that, because the state never introduced a written copy of the policy, the district court had no way to determine if the inventory was actually conducted according to the department's policy. Our decision in *Rodewald*, however, demonstrates that both the existence of standard inventory procedures, as well as compliance with those procedures, may be established through testimony and does not require admission of the policy itself into evidence.

In *Rodewald*, the defendant sought to suppress evidence found in his wallet by a police officer and jailer conducting an inventory search of the defendant as part of the booking process. 376 N.W.2d at 418. Both the officer and jailer testified that such searches were standard procedure and included looking in wallets. The jailer further testified that this was in accordance with written jail policy. *Id.* Significantly, however, there is no indication that the written policy was admitted into evidence. Neither could recall which of them filled out an inventory sheet in that case, but the officer testified that one of them did so, and the jailer testified that an inventory is completed whenever property

is taken from an arrestee. *Id.* This court held that it was clear from this testimony "that the search was carried out in accordance with standard procedures." *Id.* at 421; *see also United States v. Lowe,* 9 F.3d 43, 45–46 (8th Cir.1993) (rejecting claim that a written inventory policy is required to establish the existence of standard procedures).

■ In this case, Miller testified that it was standard department policy in 1978 to inventory the contents of impounded cars and to make a list of those contents. He also provided details about the search itself. He testified that he and the officer assisting him removed all the items from Ture's car and put them on the garage floor around the car, and that he recorded them on a detailed list as they were returned to the car.

In response, Ture argues that the fact that some items removed from the car were not identified on the inventory list demonstrates that the inventory search was not conducted according to department policy but was conducted with an investigatory motive. Miller acknowledged at trial that some items, including the metal bar, the toy car, and—possibly— the ski mask, were not recorded on the inventory list. We note, as discussed above, that the metal bar was properly seized at the time of Ture's arrest and was not involved in the inventory search of Ture's car. With respect to the other items, Miller explained that during the inventory they found a number of notebooks and pieces of paper listing license numbers, descriptions of females, first names (over 200), and descriptions of travel routes from places of work to houses. Because this seemed unusual, Miller notified his superiors, who took possession of several items, including the toy car and ski mask, in addition to the notebooks, pieces of paper, and the metal bar. Miller testi-fied that, because he recorded items on the inventory list as they were returned to the car, items taken by his superiors before being returned would not necessarily have made it onto the list. Ture points to nothing in the record that would cast doubt on Miller's explanation, nor does he explain why failing to list a few of the numerous items found in the car renders the entire search invalid. As it was in *Rodewald,* it is clear here that the inventory search of Ture's car was conducted in accordance with standard procedures.

■ Although Ture asserts that the police had an investigatory motive when they searched his car, an inventory search need only be conducted *in part* for the purpose of obtaining an inventory. *Holmes,* 569 N.W.2d at 188. To be invalid, the investigatory motive must be the *sole* purpose behind the search, meaning that the search would not have occurred but for the investigatory motive. *Id.* Because the car Ture was driving was reported stolen, there is no question that impounding the car was proper. And, given Miller's undisputed testimony that it was standard procedure to perform inventory searches of impounded cars, there is no basis for concluding that the purported investigatory motive was the sole purpose behind the inventory. Because we conclude that the inventory search of Ture's car was conducted in accordance with standard procedures and that the inventory search was conducted at least in part for the purpose of obtaining an inventory, the seizure of the toy car and ski mask was proper.

*Retaining the Seized Items*

■ Ture argues that the district court erred in holding that, under Minn.Stat. § 626.04 (1978), the state had the authority to retain his property after he was released without charges following his December 19, 1978, arrest.

The version of section 626.04 in effect in 1978[2] provides, in relevant part:

> When any officer shall seize, with or without warrant, any property or thing, the same shall be safely kept by direction of the court or magistrate, so long as may be necessary for the purpose of being produced as evidence on any trial, and then the property or things shall, unless otherwise subject to lawful detention, be returned to the owner thereof, or to such other person as may be entitled to the possession of the same and the other things so seized may be destroyed or otherwise disposed of under the direction of the court or justice of the peace.

Ture argues that the statutory language indicating that property seized by an officer "shall be safely kept by direction of the court or magistrate so long as may be necessary for the purpose of being produced as evidence on any trial" means that the police must obtain specific permission from a court in order to retain seized property. The state argues that this interpretation is absurd because it would "place an enormous burden on law enforcement and on district courts" by "requir[ing] police to obtain judicial authorization every time evidence is seized and not immediately returned." The state interprets the statutory language as meaning "that evidence held by the police is under the direction of the court; [it] is under the court's control, and may be ordered returned by the court." We agree with the state's interpretation of section 626.04 and conclude that retention of the metal bar, the toy car, and the ski mask was not improper.

Ture also argues that, after his 1981 trial for the murder of Diane Edwards, see *State v. Ture*, 353 N.W.2d 502 (Minn.1984), the state was required to return his property "unless otherwise subject to lawful detention." The problem with this argument is that it ignores the statutory language that permits the seized property to be retained "so long as may be necessary for the purpose of being produced as evidence on any trial." Because Ture continued to be a suspect in the Huling murders, particularly in light of his confessions to Toby Krominga and Randall Ferguson, but had not been tried for any of them, retention of the items for the purpose of introducing them at a future trial was proper.

## II.

We next address whether the district court erred when it permitted the state to introduce the toy car seized from Ture's car or when it allowed an expert witness to testify that the leather-wrapped metal bar seized from Ture's car caused the bruise injury found under Alice Huling's right breast.

### Toy Car

Ture moved to suppress the toy car and evidence related to it on the basis that it was irrelevant and prejudicial.[3] Following a pretrial hearing held in December 1999

---

2. Section 626.04 was amended in 1983. Act of June 14, 1983, ch. 359, § 111, 1983 Minn. Laws 2488. Although the amendment removed obsolete references to "justice of the peace" and "magistrate" and made other changes as well, the statutory language at issue in this case—"shall be safely kept by direction of the court"—was not changed. No amendments have occurred since 1983.

3. As noted previously, Ture was interviewed on December 20, 1978, by Deputy James Kostreba and Detective Ross Baker of the Stearns County Sheriff's Department. A transcript of that audiotaped interview shows that the following colloquy took place regarding the toy car:

Q: I noticed a little toy there. A little thing with Batman, was that in the car when you

on this issue, the court denied Ture's motion, finding the toy car to be "clearly relevant to the possibility that [Ture] was at the murder site." The court also found that the jury could properly weigh the evidence without any undue prejudice to Ture.

██ Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401. Rule 401 "adopts a minimal relevancy approach." *State v. Provost,* 490 N.W.2d 93, 99 (Minn.1992). Rulings on the "relevancy of evidence are generally left to the sound discretion of the trial court." *State v. Horning,* 535 N.W.2d 296, 298 (Minn. 1995).

██ Ture argues that the toy car was irrelevant because "no logical basis" supports the inference that it was William's car. We disagree. The seized toy car supports an inference that Ture was present at the Huling house. This is particularly true, as the district court noted, in light of Ture's alleged statements to Randall Ferguson concerning the toy car. Moreover, given Ture's evasive responses during the December 20, 1978, interview

concerning the toy car's origin and their inconsistency with Ture's testimony at the suppression hearing, the toy car is directly relevant to the question of Ture's guilt. This satisfies Rule 401's "minimal relevancy approach." *Provost,* 490 N.W.2d at 99.

██ Ture next claims that, under Minn. R. Evid. 403, the prejudicial effect of admitting the toy car substantially outweighed its probative value. He argues that the toy must have had "a powerful effect on the jury" because "the incredibly sad events that befell William Huling" must have made them want to believe that it was William's. This argument lacks merit. While it suggests that *William Huling's experience* had a prejudicial effect on the jury, it says little if anything about the *toy car's* prejudicial effect. Ture has offered no other basis on which we can conclude that the prejudicial effect of admitting evidence related to the toy car substantially outweighed its probative value. We therefore conclude that the district court did not abuse its discretion when it admitted evidence related to the toy car at trial.

*Expert Testimony*

██ Trial courts have discretion in determining whether to admit an expert's

Q: got it too or do you recall where that might have come from?
A: It's mine. I got grandkids.
Q: Oh, you have grandkids?
A: My daughter does. I'm uncle or whatever.
Q: Well if your daughter has children well then you'd be a grandfather then, huh?
A: Yea.
Q: How old are you?
A: No. I mean my sister[.]
Q: Oh your ... ?
A: Uncle, yea. Uncle.
Q: Your your [sic] uncle's children and they would be what, they would be your grandchildren or won't be his grand....?
A: I'm the uncle. My sister's got kids I'm the uncle, right?

Q: Oh, I see. Alright. And then you were around them after you picked up this car here?
A: Well what is that ah difference that a couple of toys make?
Q: Well it might make a lot of difference. You never know. Huh. I just wanted to know if you know where that one come from if it was in the car or or [sic] not? Do you recall it?
A: No, I don't see where it makes any difference.
Q: Well it could though. It could make a difference.
A: Well until you prove it to me.
Q: Prove what. I mean where you got it?
A: No. Till you prove me what this whole charade is.

opinion. *State v. Bradford,* 618 N.W.2d 782, 793 (Minn.2000) (citation omitted). Here, the district court permitted Dr. Daniel Davis to testify that the metal bar caused the bruise found under Alice Huling's right breast. Ture argues that it was "outside the realm of Dr. Davis's expertise" and of forensics "to conclude that *only* the bar owned by Mr. Ture could have inflicted the bruise." Specifically, Ture argues that it was improper for Dr. Davis to give the "categorical judgment" that it was Ture's bar that caused the bruise because Dr. Davis did not know whether identical bars existed among "the untold numbers of objects in the world."

As the state points out, however, accepting Ture's argument would mean that "no witness can ever make a positive identification of an object" because no witness could claim to have seen every object in the world. Moreover, Dr. Davis did not make a categorical statement that no other bar could have caused the bruise. He merely stated, "I would find it hard to believe that we're ever going to find another bar just like this anywhere in the world." Thus, the jury was aware that Dr. Davis understood that an identical bar might exist but that, in his opinion, it was highly unlikely.[4] We therefore conclude that the district court did not abuse its discretion in permitting Dr. Davis to testify that the metal bar caused the bruise.

### III.

■■■■■ With respect to the claims raised in Ture's pro se brief, Ture first argues that his request for a change of venue should have been honored because of the publicity in this case. However,

Ture provides nothing to sustain his burden of proving "actual prejudice" from the publicity. *State v. Everett,* 472 N.W.2d 864, 866 (Minn.1991). Ture also claims ineffective assistance of counsel. To prevail, Ture has the burden of demonstrating that (1) his counsel's representation fell below an objective standard of reasonableness and (2) a reasonable probability that the outcome would have been different but for counsel's errors. *State v. Lahue,* 585 N.W.2d 785, 789 (Minn.1998). Although Ture advances several alleged errors committed by his trial counsel, he makes no attempt to establish either of the above elements and therefore fails to meet his burden. Finally, Ture claims that, because he was not given the *Miranda* warning at any time, his alleged admissions to law enforcement investigators should not have been admitted. Again, Ture fails to provide any authority or argument to support this claim and we therefore deem that claim waived. *See McKenzie v. State,* 583 N.W.2d 744, 746 n. 1 (Minn.1998) (defendant who "allude[d]" to certain issues in his brief waived those issues by failing to address them in the argument portion of his brief).

Affirmed.

---

4. While Ture complains about Dr. Davis's testimony, he does not complain about Dr. McGee's. Yet we see no substantive difference between Dr. Davis's testimony and the testimony of Dr. McGee—that the bruise was caused by either Ture's metal bar or one of "similar configuration," meaning a metal bar that "look[s] identical." Thus, had Dr. Davis's testimony on that point been excluded, the outcome would have been the same.