Jason D. HAGER, Petitioner, Appellant,

v.

COMMISSIONER OF PUBLIC
SAFETY, Respondent.

No. C5–85–1678.

Court of Appeals of Minnesota.

March 4, 1986.

S. Warren Gale, Bloomington, for appellant.

Hubert H. Humphrey, III, Atty. Gen., Ann Elizabeth Cohen, Lawrence M. Schultz, Sp. Asst. Attys. Gen., St. Paul, for respondent.

Heard, considered and decided by HUSPENI, P.J., and FOLEY and NIERENGARTEN, JJ.

## OPINION

HUSPENI, Judge.

Appellant Jason D. Hager's driving privileges were revoked pursuant to the implied consent law. He petitioned for judicial review and the trial court sustained the revocation. We affirm.

## FACTS

On March 24, 1985, at approximately 2:22 a.m., Officer James Thorstad was eastbound on Brooklyn Boulevard near Regency Avenue in Brooklyn Park, when he observed Hager's vehicle which had one headlight out and no visible rear license plate. Thorstad stopped Hager's vehicle, and asked for his driver's license. While talking to him, Thorstad observed that Hager's eyes were bloodshot and watery and his breath had the odor of an alcoholic beverage.

Thorstad requested, and Hager agreed to, a preliminary breath test which registered a failing result. Thorstad arrested Hager for driving while intoxicated and transported him to the Brooklyn Park police station. At approximately 2:40 a.m., Thorstad, who was a certified Intoxilyzer operator, attempted to administer the breath test to Hager by pushing the start button on the Intoxilyzer and inserting a test record.

The Intoxilyzer first performed internal diagnostic checks; the temperature was 45°C plus or minus 5°C and the air blank had a reading of .000. Both readings were within established tolerances. Before Hager gave the sample, Thorstad inspected his mouth and observed some gum. Thorstad discontinued the test and had Hager spit out the gum.

After waiting about five minutes, at approximately 2:51 a.m., Thorstad administered another breath test to Hager. The Intoxilyzer first performed internal diagnostic checks, with the temperature reading 45°C plus or minus 5°C and with an air blank reading of .000, both of which were within established tolerances.

Hager gave his first breath sample. It was adequate, and registered an alcohol concentration of .129 with a replicate reading of .130. The Intoxilyzer then performed an air blank check, with a reading of .000. Thorstad performed a calibration standard analysis, with a reading of .106 and a replicate reading of .109. All of these readings were within established tolerances.

Hager then gave a second breath sample, which was adequate and registered an alcohol concentration reading of .111, with a replicate reading of .116. The Intoxilyzer calculated a breath correlation of .88, and gave a reported value of .11 for Hager's test.

When the testing was completed, Thorstad did not ask Hager whether he wished to consult with an attorney. Thorstad transported Hager to a friend's apartment.

Hager testified at the implied consent hearing that he started chewing the gum shortly before being stopped by Thorstad. From his other testimony, the court found that it appeared Hager did not consume alcoholic beverages after he started chewing gum.

## ISSUES

1. Did the trial court err in concluding that the test was reliable?

2. Did the trial court err when it determined that the police officer had sufficient probable cause to invoke the implied consent law and to justify the arrest?

3. Was appellant denied his statutory right to consult with an attorney or his statutory right to have an independent test done?

## ANALYSIS

### I.

Hager contends that the trial court erred when it admitted the Intoxilyzer test results into evidence, because Thorstad observed Hager for only five minutes after the gum was removed from his mouth prior to beginning the test, and because the breath correlation of the two breath samples was only 88%.

■ As a preliminary matter, we note that Hager included an Intoxilyzer manual in his appellate brief appendix which was not introduced in the trial court. We cannot consider material that was not a part of the trial court record. *Hasan v. McDonald's Corp.*, 377 N.W.2d 472, 473 (Minn.Ct.App.1985).

The standard which must be met in order to lay a sufficient foundation to introduce a test into evidence is well settled. "The proponent of a chemical or scientific test must establish that the test itself is reliable and that its administration in the particular instance conformed to the procedure necessary to ensure reliability." *State v. Dille*, 258 N.W.2d 565, 567 (Minn.1977). The reason behind this rule is that without such a foundation, the test is not probative and is therefore irrelevant. *Id.* The proponent does not have an absolute burden to show trustworthiness. *Tate v. Commissioner of Public Safety*, 356 N.W.2d 766, 768 (Minn. Ct.App.1984). After a prima facie showing of trustworthy administration, the opponent must suggest reasons why the test was untrustworthy. *Id.* (quoting *Dille*, 258 N.W.2d at 568).

In this case, Thorstad initialed the space on the test form indicating "subject has been under observation for 15–20 minutes," and stated that during the observation period, Hager put nothing in his mouth. When Thorstad was about to have Hager give the first breath sample, he checked Hager's mouth and discovered gum. Thorstad had Hager remove the gum and waited "a proper time," five or six minutes, before commencing the test. Thorstad explained that the main concern with gum arises when the breathalyzer is used, but the chewing of gum is never a problem with the Intoxilyzer. He stated that with the Intoxilyzer, if there is an interference present other than alcohol or acetone, the machine will shut itself down. He testified that they were more concerned about anything containing alcohol, which could cause a difference in the test. To the best of the officer's knowledge, the gum that Hager was chewing was "plain ordinary chewing gum."

This court has addressed departures from breath-testing procedures before. In *Kooi v. Commissioner of Public Safety*, 363 N.W.2d 487 (Minn.Ct.App.1985), we considered a situation where all twenty-five steps of the Bureau of Criminal Apprehension checklist for the breathalyzer were not followed. We noted that where the circumstances show sufficient indicia of reliability, it is not necessary that all twenty-five steps be followed. *Id.* at 489. In *Haegele v. Commissioner of Public Safety*, 353 N.W.2d 704 (Minn.Ct.App.1984), this court found that where the operator failed to follow all requirements of a breathalyzer checklist and used an ampoule that did not meet the minimum standards established by the BCA, the trial court erred in sustaining the revocation of appellant's driver's license, because the testing method made the results unreliable.

■ The trial court here found that Hager presented no evidence showing that chewing gum after consuming alcoholic beverages would in any way artificially raise the results of the Intoxilyzer test, or that the officer should have waited more than five minutes before administering the second test. We believe the Commissioner met his burden of showing trustworthiness,

and that Hager failed to present evidence challenging the reliability and accuracy of the test. *See Noren v. Commissioner of Public Safety,* 363 N.W.2d 315 (Minn.Ct. App.1985).

The test also showed a "breath correlation" of 88%. No testimony was presented at the hearing as to the meaning of this figure. In *Abe v. Commissioner of Public Safety,* 374 N.W.2d 788, 791 (Minn.Ct.App. 1985), this court noted that the BCA has recommended that when the correlation between the two tests is below 90%, the officer should run another test. In *Abe,* the appellant argued that the evidence was insufficient to show that the Intoxilyzer tests were valid because the correlation was below 90%. In *Abe,* this court held that the evidence supported the trial court's finding that the breath test showed a concentration of .10 or more, despite a breath correlation of 87%, when the machine was run by a certified operator, the machine was in proper working order, the chemicals were in proper condition, the room air results were within acceptable limits, and the test results were above .10. *See also Zern v. Commissioner of Public Safety,* 371 N.W.2d 82 (Minn.Ct.App.1985), (breath correlation of 89%; trial court erred in finding that the Commissioner failed to prove alcohol concentration of .10 or more).

In view of this court's holdings in *Abe* and *Zern,* we find no error in the trial court's admission of the test into evidence despite the 88% breath correlation figure.

Hager further argues that the failure to wait fifteen minutes after he removed the gum from his mouth and the low breath correlation together invalidate the test results. We cannot agree. Unquestionably, it would have been preferable to comply with the fifteen-minute waiting requirement. *See Dixon v. Commissioner of Public Safety,* 372 N.W.2d 785, 786 (Minn.Ct.App.1985). Strict adherence to the procedural requirements of testing should always be observed. Such adherence benefits both the driver and the Commissioner, and may obviate the necessity of review in many cases. However, the trial court's determinations regarding both the gum chewing and the breath correlation are independently sound. We deem it neither necessary nor proper to aggregate these factors and thereby determine that the testing process was invalid.

## II.

Hager also alleges that the trial court erred in concluding that Thorstad had sufficient probable cause to invoke the implied consent law and to justify his arrest for driving while intoxicated. Minn.Stat. § 169.123, subd. 2(a) (1984) provides that:

The test may be required of a person when an officer has probable cause to believe the person was driving, operating, or in physical control of a motor vehicle in violation of section 169.121 and one of the following conditions exist: (1) the person has been lawfully placed under arrest for violation of section 169.-121, or an ordinance in conformity with it; * * * or (4) the screening test [provided for by section 169.121, subd. 6] was administered and recorded an alcohol concentration of 0.10 or more.

Minn.Stat. § 169.121, subd. 6 (1984) provides that:

When a peace officer has reason to believe from the manner in which a person is driving, operating, controlling, or acting upon departure from a motor vehicle, or has driven, operated, or controlled a motor vehicle, that the driver may be violating or has violated [section 169.121, subd. 1], he may require the driver to provide a sample of his breath for a preliminary screening test using a device approved by the commissioner of public safety for this purpose. The results of this preliminary screening test shall be used for the purpose of deciding whether an arrest should be made and whether to require the tests authorized in section 169.123, but shall not be used in any court action except to prove that a test was properly required of a person pursuant to section 169.123, subdivision 2.

■ In order to require the preliminary screening test, the officer must have specific and articulable suspicion of a violation of Minn.Stat. § 169.121. *State, Department of Public Safety v. Juncewski,* 308 N.W.2d 316, 321 (Minn.1981).

The trial court here found that Thorstad observed that Hager's eyes were bloodshot and watery, and that his breath had an odor of an alcoholic beverage. In view of these observed indicia of intoxication, the preliminary screening test was appropriately administered, and the trial court properly relied on the results of that test and Hager's physical appearance in finding probable cause. The trial court did not err in determining that Thorstad lawfully placed Hager under arrest for violation of Minn.Stat. § 169.121.

■ Thorstad testified that he did not check Hager's mouth prior to administering the preliminary breath test and that if he had known Hager was chewing gum he would have had him remove it. Hager now contends that the presence of gum in his mouth requires that the results of the preliminary screening test be disregarded when evaluating the facts to determine whether probable cause existed. The trial court rejected this argument, finding that no evidence was introduced indicating that chewing gum after consuming alcoholic beverages would artificially raise the results of the preliminary screening test. We, too, reject Hager's argument. General allegations that test results were affected by a substance, without specific proof, cannot be used to invalidate the test results. *Fritzke v. Commissioner of Public Safety,* 373 N.W.2d 649, 651 (Minn.Ct.App. 1985). The trial court did not err.

### III.

■ Finally, Hager contends that after finishing the chemical testing, the police officer had both a duty to ask him whether he wished to use a telephone to call an attorney and a duty to arrange an independent test. Hager contends that because the officer failed to do either, the revocation was improper.

The police officer read the implied consent advisory to Hager. That advisory requires in relevant part that at the time a test is requested the person shall be informed:

> that after submitting to testing, the person has the right to consult with an attorney and to have additional tests made by a person of his own choosing * * *.

Minn.Stat. § 169.123, subd. 2(b)(4) (1984). The only advisory that the police must give a person under the implied consent law is that mandated by statute. *Holtz v. Commissioner of Public Safety,* 340 N.W.2d 363, 365 (Minn.Ct.App.1983). There is no requirement that the officer affirmatively offer a driver the use of a telephone to call an attorney.

The implied consent statute also provides that:

> The person tested has the right to have a person of his own choosing administer a chemical test or tests in addition to any administered at the direction of a peace officer; provided, that the additional test sample on behalf of the person is obtained at the place where the person is in custody, after the test administered at the direction of a peace officer, and at no expense to the state. The failure or inability to obtain an additional test or tests by a person shall not preclude the admission in evidence of the test taken at the direction of a peace officer unless the additional test was prevented or denied by the peace officer.

Minn.Stat. § 169.123, subd. 3 (1984).

Initially, we note that after Hager was given the test, Thorstad commendably drove him to his friend's house. Hager was then no longer in custody. Even while in custody, the only obligation that Thorstad had was to allow Hager the use of a telephone. *Frost v. Commissioner of Public Safety,* 348 N.W.2d 803, 804 (Minn.Ct. App.1984). In *State v. Hatlestad,* 347 N.W.2d 843, 845 (Minn.Ct.App.1984), this court held that when the officer called two hospitals, he gave more assistance than the

statute requires. Thorstad was not required to arrange an opportunity for Hager to obtain additional testing. *See State v. Streitz*, 276 Minn. 242, 150 N.W.2d 33 (1967). We will not construe Thorstad's offer to transport Hager to a friend's house in such a way as to place upon Thorstad duties not required under the statute.

## DECISION

The trial court did not err in sustaining the revocation of appellant's driving privileges.

Affirmed.