**STATE of Minnesota, Respondent,**

**v.**

**Kevin Lemont HOLMES,
petitioner, Appellant.**

**No. C5–96–901.**

Supreme Court of Minnesota.

Sept. 18, 1997.

David M. Gross, St. Louis Park, for appellant.

Jay Heffern, Minneapolis City Atty., Timothy T. Mulrooney, Special Asst. City Atty., Minneapolis, Hubert H. Humphrey, III, Minn. Atty. Gen., St. Paul, for respondent.

## OPINION

TOMLJANOVICH, Justice.

The state on December 8, 1995 charged Kevin Lemont Holmes with transporting a pistol inside a motor vehicle without a permit. The police on November 20, 1995 discovered a pistol inside the locked glove compartment of an automobile that Holmes admitted he had parked just outside the Bierman Athletic Building on the University of Minnesota campus. After an omnibus hearing, the trial court suppressed evidence of the pistol and Holmes' statement that he in fact had placed the pistol inside the glove compartment, and consequently the court dismissed the charge for lack of evidence. In particular, the court found that the police lacked reasonable suspicion to stop and frisk Holmes, that the police's search of the automobile was constitutionally unreasonable, and that the police failed to adequately administer a *Miranda* warning before receiving Holmes' statements. The state appealed, and the court of appeals in an unpublished opinion reversed the trial court's suppression of both the pistol and the statements, and consequently reinstated the charge. Upon Holmes' petition for review, we reverse the court of appeals and affirm the trial court's dismissal of the charge.

A parking monitor with the University of Minnesota Police Department (UMPD) discovered a 1986 Oldsmobile Cutlass with Minnesota license plate number 773 CJA parked in a contract lot behind the Bierman Athletic Building on the University of Minnesota campus on November 20, 1995. The monitor parked her vehicle directly behind the Cutlass, exited and proceeded to look for the Cutlass' parking permit. When she noticed that the unattended vehicle did not have the appropriate permit, the monitor started to write a parking ticket using her hand-held computer. Upon entering the appropriate information into the computer, the monitor learned that there were five or more unpaid parking tickets on the Cutlass. The monitor then called the UMPD dispatcher on duty at the time. The dispatcher subsequently checked with Hennepin County officials, who informed the dispatcher that there were in fact seven unpaid parking tickets on the Cutlass, and that the dispatcher should order the car towed pursuant to Minnesota Statutes section 169.041, subdivision 4(13)(1996) (allowing for tow when police have "probable cause to believe that the owner, operator, or person in physical control of the vehicle has failed to respond to five or more citations for parking or traffic offenses"). The dispatcher relayed the information to the monitor, who subsequently wrote the ticket and ordered a "white tag tow," a procedure where the parking monitor or police officer remains with the vehicle until the truck arrives.

Shortly thereafter, Holmes and a friend approached the Cutlass. Holmes testified at the omnibus hearing that he and his friend sat inside the Cutlass and waited for the monitor to move her vehicle out of the way. When the monitor did not move her vehicle,

Holmes testified that he got out of the car, and that his friend remained inside the car with his foot outside the door. The monitor explained to Holmes that she was impounding the vehicle because of the outstanding parking tickets. Holmes said he was unaware of the tickets because the car belonged to his wife. He subsequently asked the monitor to cancel the tow. He also promised to pay the tickets the following day. The monitor refused the request and told Holmes that he should get his things out of the car. Holmes then went back to the car to retrieve his school books and other personal property. The monitor testified that Holmes remained cooperative and respectful throughout the incident. Despite this, the monitor called the UMPD for assistance because she said she felt intimidated. Shortly thereafter, an officer from the UMPD arrived on the scene, parking her vehicle directly behind the monitor's vehicle. Holmes and the officer exited their vehicles and met alongside the parking monitor's vehicle.

Holmes asked the officer why she had been summoned, and the officer said she was there because the monitor had requested support. Holmes at this time reiterated the fact that the car belonged to his wife and that he was unaware of the parking tickets. The officer then asked Holmes to remove his hands from his pockets and provide some identification. Holmes testified that he thought the officer asked for a driver's license, and that he did not feel free to leave the scene. Upon his first attempt to locate his driver's license, Holmes found only his University of Minnesota identification card, which he removed from his pocket and gave to the officer. Shortly thereafter, Holmes again placed his hands in his pockets [1] and the officer asked him once again to remove his hands from his pockets and accompany her back to her vehicle. After the two arrived at the squad car, the officer informed Holmes that she needed to pat him down before placing him in the squad car. Upon patting Holmes' outer clothing, the officer felt a hard object. She asked Holmes what

the object was, and at first he did not respond. The officer then asked if she could look inside Holmes' pocket and Holmes said she could. Holmes then told the officer that the object was a magazine clip. The officer then removed the magazine clip and asked Holmes where the rest of the weapon was located. Holmes said it was at home. The officer then finished the pat-down of Holmes and placed him in the rear of the squad car. The officer testified that the back doors to the squad car were locked and that Holmes had no way to get out. The officer then had a conversation with Holmes, at which time Holmes gave the officer his paper driver's license for the purpose of identification. Holmes also testified that the officer asked him if he wanted to get anything out of the car, and Holmes said he would like to get his son's stroller out of the trunk. Holmes testified that the officer asked him for his keys, which he gave her. The officer testified, however, that she found the keys in the ignition. At about this time, Holmes' friend exited the Cutlass and the officer asked him to leave the scene, which he did.

Some time prior to this, the parking monitor had walked around the car and glanced inside to inventory any items within the vehicle. The trial court found that the parking monitor was the officer ordering the tow and as such was the person responsible for the inventory search under UMPD policy. Shortly thereafter, the officer took the keys and opened the trunk. She then entered the vehicle, where she discovered an unsecured and empty gun case on the floor behind the driver's seat. The officer then used one of the keys on Holmes' key chain to unlock the glove compartment, where she found a .40 caliber Ruger semi-automatic handgun. At that time the officer radioed to have a sergeant dispatched to the scene. The sergeant arrived on the scene to secure the pistol. Upon pulling back the slide, the sergeant found no bullets in the chamber,[2] but upon taking the magazine clip out from inside the pistol, he found it filled with the same type of

---

1. Holmes testified that he was looking for his paper driver's license.

2. A firearms expert testified that the weapon would not fire a bullet until the shooter first moved a bullet from the magazine to the chamber by pulling the slide back.

hollow-point bullets found inside the magazine clip taken from Holmes' jacket pocket. Holmes also testified that the officer eventually removed the baby stroller and other personal items from the car for the purpose of safekeeping.

The officer then returned to her car, where she informed Holmes about the pistol found in the glove compartment. Holmes stated that he forgot he had placed the pistol in the glove compartment after a recent trip to a local target shooting range. The officer then handcuffed Holmes, arrested him and transported him to the University Police Department. Holmes was then taken to Hennepin County Jail. An officer met with Holmes inside one of the interview rooms at the jail facility. This officer testified that he immediately informed Holmes of his *Miranda* rights, and that Holmes said he understood those rights and agreed to speak with the officer. Holmes testified that he received no such warning and gave no such waiver. At no point did the officer record such a waiver in his reports of the interview. The officer then told Holmes he was going to tape-record the conversation, which the officer then attempted to do. But after the complete interview, the officer discovered that the tape recorder had malfunctioned and failed to record any of the interview. According to the officer's testimony, Holmes stated during the interview that the pistol was his and that he did not have a permit to carry it. As such, the state on December 8, 1995 charged Holmes with the unlawful possession of a pistol·in violation of Minnesota Statutes section 624.714, subdivision 1 (1996).

Holmes appeals two distinct holdings of the court of appeals. The first holding reversed a trial court order suppressing evidence of the pistol and Holmes' statements. The second holding affirmed the trial court's order denying Holmes' motion to dismiss the charge pursuant to his proof that the permit exception enunciated in Minnesota Statutes section 624.714, subdivision 9(e)(1996) applied. Because our holding on the evidentiary issue is dispositive, we will not address the statutory ruling.

I.

■ In reviewing the appeal of a pretrial ruling, we will reverse a trial court determination "only if the state demonstrates clearly and unequivocally, first, that the trial court erred in its judgment, and, second, that unless reversed, the error will have a critical impact on the outcome of the trial." *State v. Kim*, 398 N.W.2d 544, 547 (Minn.1987). The dismissal of the charge following a suppression of all the evidence clearly meets the critical impact element, and consequently, we will reverse the trial court's ruling only if the state demonstrates clearly and unequivocally that the trial court erred in its judgment.

Minnesota law makes it a gross misdemeanor for a person to carry, hold or possess "a pistol in a motor vehicle, snowmobile or boat * * * without first having obtained a permit to carry the pistol * * * ." Minn.Stat. § 624.714, subd. 1 (1996). We have determined that the statute requires the state to show "that the accused did carry, hold, or possess a pistol" in one of the unlawful locations mentioned in the statute. *State v. Paige*, 256 N.W.2d 298, 302 (Minn.1977). The most important question before us, therefore, is whether the state properly procured the evidence necessary to establish probable cause that Holmes carried, held or possessed the pistol found in the Cutlass. This analysis necessarily will involve two specific pieces of evidence—the pistol and Holmes' statements that he indeed placed the pistol inside the vehicle's locked glove compartment. The analysis also will involve two specific police acts—the stop, or seizure, of Holmes, and the search of the Cutlass.

We begin with the stop, or seizure, of Holmes.

■ The Fourth Amendment to the United States Constitution prohibits the state from making unreasonable searches or seizures of a person. U.S. Const. amend. IV. The United States Supreme Court has held that a police officer can lawfully make an investigative seizure, commonly referred to as an investigative stop, of an individual if the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio*,

392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968); *State v. Gilchrist,* 299 N.W.2d 913, 916–17 (Minn.1980). It is undisputed that the officer in the case at bar made such an investigative stop of Holmes when she asked for, received and then retained possession of Holmes' University of Minnesota identification card.[3] The question before us, therefore, is whether the fact that the officer at the scene observed Holmes exiting an automobile with seven outstanding parking tickets provided her with a "particularized and objective basis for suspecting [Holmes] of criminal activity." *Berge v. Commissioner of Public Safety,* 374 N.W.2d 730, 732 (Minn.1985) (quoting *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981)).

Although there is little doubt that the facts in this case provided the officer with a "reasonable suspicion" that Holmes had illegally parked an automobile with seven prior parking tickets, such suspicion does not by itself justify the type of seizure authorized by *Terry.* As one noted commentator has stated, the Supreme Court has indicated that "[t]he *Terry* rule should be expressly limited to investigation of *serious* offenses." 4 Wayne R. LaFave, *Search and Seizure* § 9.2(c), at 32 (3d ed.1996) (hereinafter LaFave) (emphasis added); *see United States v. Hensley,* 469 U.S. 221, 229, 105 S.Ct. 675, 680–81, 83 L.Ed.2d 604 (1985) (stating that it is unclear "whether *Terry* stops to investigate all past crimes, however serious, are permitted"); *United States v. Sharpe,* 470 U.S. 675, 689 n. 1, 105 S.Ct. 1568, 1577 n. 1, 84 L.Ed.2d 605 (1985) (Marshall, J., concurring) (stating that the Supreme Court has never "suggested that all law enforcement objectives, such as the investigation of possessory offenses, outweigh the individual interests infringed upon"). As such, the question before us is whether a *parking violation* is a serious enough offense to merit the type of investigatory seizure authorized by *Terry.*

■ The state contends that the seizure in the case at bar is a legitimate *Terry* stop

because it is similar to those routine traffic stops made by police officers who *observe a traffic violation. See Whren v. United States,* 517 U.S. 806, ––––––––, 116 S.Ct. 1769, 1776–77, 135 L.Ed.2d 89 (1996) (stating that routine traffic stops are constitutional where police have probable cause to believe that a traffic violation has occurred); *State v. Pike,* 551 N.W.2d 919, 921–22 (Minn.1996) (same); *Berge,* 374 N.W.2d at 733 (same). The flaw with the state's reliance upon this line of cases, however, is that a parking violation is not as serious as a traffic violation. Although there has been much debate over what types of violations are serious enough to merit a *Terry* stop, there can be no debate that a parking violation is not among them. *See Whren,* 517 U.S. at ––––, 116 S.Ct. at 1772 (stating that the decision to stop an automobile is reasonable where police have probable cause to believe a traffic violation has occurred). It is essential to remember that *Terry* authorizes a police officer to temporarily seize a person on less than probable cause. As a protective measure, the Supreme Court necessarily has limited such seizures to those situations where the suspected violation is serious. As a result, we hold that a police officer who merely has reasonable suspicion that a *parking* violation has occurred cannot seize an individual for the purpose of investigation.

A police officer who has probable cause to believe that a person has committed a parking violation can stop the person only if the stop is necessary to enforce the violation, for example, if a person is attempting to drive off with an illegally parked car before the officer can issue the ticket. We conclude, as did the trial court, that the officer did not stop Holmes for the purpose of enforcing the known violation. Not only do police officers typically enforce parking violations by applying a ticket to the parked car, the facts show that the parking monitor on the scene already had *enforced* the violation by issuing the ticket and ordering the tow. As such, we

---

**3.** Typically in such cases, the state will argue that the challenged police activity did not rise to the level of a "stop" within the confines of *Terry.* The state concedes, however, that the police officer stopped Holmes when she asked for identification.

cation. *See* 4 Wayne R. LaFave, *Search and Seizure* § 9.3(a), at 103 n.74 (3d ed.1996) (gathering cases where courts have found that the act of holding a person's identification papers or other property constitutes a stop.)

hold that the police officer's seizure of Holmes was unreasonable and therefore unconstitutional, and we consequently affirm the trial court's order suppressing all the evidence that came as a result of the subsequent frisk and interrogation of Holmes. Given this holding, we need not address whether the officer's pat-down search was within the confines of the Fourth Amendment, or whether the officer's interrogation was within the confines of *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).

## II.

Holmes next argues that the trial court correctly suppressed evidence of the pistol because the search conducted by the police officer at the scene was not reasonable. The gravamen of Holmes' argument is that the police officer's inventory search was pretextual; that is, the police officer searched the vehicle, not for the purpose of inventorying the items inside the vehicle, but for the *sole* purpose of finding the pistol that accompanied the magazine clip found inside Holmes' jacket pocket. The state, on the other hand, does not dispute that the acts which led to the discovery of the pistol constituted a search of the Cutlass within the meaning of the Fourth Amendment to the United States Constitution. *See United States v. Lawson,* 487 F.2d 468 (8th Cir.1973) (stating that search for purposes of inventory is a search within contemplation of Fourth Amendment); *City of St. Paul v. Myles,* 298 Minn. 298, 218 N.W.2d 697 (1974) (same). Instead, the state contends that the trial court erred in suppressing evidence of the pistol because the warrantless search that led to the pistol's discovery was a valid inventory search of the Cutlass.[4] The state contends that the subjective motivation of the police officer is irrelevant to our determination of an inventory search's reasonableness. It cites *State v.*

*Rodewald,* 376 N.W.2d 416, 421 (Minn.1985) for the proposition that the inventory exception to the warrant requirement is a "bright line" rule, and that as long as the police follow "established, standardized procedures in conducting an inventory search, the search is valid and the motives of the officer conducting the search are *entirely irrelevant.*" The court of appeals agreed with the state and concluded that an inventory search is valid "if it is carried out in accordance with standard police department procedures, and it makes no difference whether the officer had an ulterior motive or expected to discover evidence." *State v. Holmes,* No. C5–96–901, 1996 WL 689804, slip op. at 11 (Minn. App. Nov. 22, 1996) (unpublished opinion).

The Supreme Court in 1976 endorsed the warrantless search of an automobile for the discrete purpose of taking an inventory of items inside an impounded vehicle. *South Dakota v. Opperman,* 428 U.S. 364, 373, 96 S.Ct. 3092, 3099, 49 L.Ed.2d 1000 (1976); *see also Illinois v. Lafayette,* 462 U.S. 640, 643, 103 S.Ct. 2605, 2608, 77 L.Ed.2d 65, (1983) (stating that inventory search is a well defined exception to the warrant requirement); *Myles,* 218 N.W.2d at 699 (stating that inventory searches are not constitutionally improper). Under the inventory exception, police need neither probable cause nor a warrant to search a vehicle. *Lafayette,* 462 U.S. at 643, 103 S.Ct. at 2608. Instead, the Court has found such searches to be reasonable because police are performing administrative or caretaking functions designed to serve two distinct interests: the protection of the owner's property inside the vehicle, and the protection of the police from claims that they lost or damaged property within their control. *Opperman,* 428 U.S. at 369, 96 S.Ct. at 3097.[5] As such, the Supreme Court accorded deference "to police caretaking *procedures* designed to secure and pro-

---

4. The state also argues that discovery of the magazine clip provided the officer with *probable cause* that contraband was inside the Cutlass, and that this justified her warrantless search under the automobile exception to the warrant requirement. Because we already concluded that police discovered the magazine clip only after illegally seizing Holmes, we need not address this argument.

5. The plurality opinion included a third interest: the protection of the police from potential danger. *Opperman,* 428 U.S. at 369, 96 S.Ct. at 3097. This interest was minimized by Justice Powell in his concurrence, however, and is no longer considered to be a justification for the exception. *Id.* at 378, 96 S.Ct. at 3101–02.

tect vehicles and their contents within police custody." *Colorado v. Bertine,* 479 U.S. 367, 372, 107 S.Ct. 738, 741, 93 L.Ed.2d 739 (1987) (emphasis added). In determining the reasonableness of an inventory search,[6] therefore, courts must ask whether police carried out the search in accordance with standard *procedures* in the local police department. *Opperman,* 428 U.S. at 374–75, 96 S.Ct. at 3099–3100. The purpose of limiting the search to those parameters defined by a standard procedure is to "ensure that the intrusion [will] be limited in scope to the extent necessary to carry out the caretaking function." *Id.* at 375, 96 S.Ct. at 3100. Although the Court in *Opperman* placed much emphasis on the general lack of discretion involved in an inventory search, *see* 428 U.S. at 383, 96 S.Ct. at 3104 (Powell, J., concurring) (stating that the "officer does not make a discretionary determination to search based on a judgment that certain conditions are present"), the Court in *Bertine* allowed for a certain level of police discretion "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Bertine,* 479 U.S. at 375, 107 S.Ct. at 743.

Although the court of appeals correctly stated that an ulterior motive does not by itself invalidate an inventory search carried out in accordance with standard police procedure, *see Rodewald,* 376 N.W.2d at 421; *United States v. Lomeli,* 76 F.3d 146, 148 (7th Cir.1996) ("the fact that an inventory search may also have had an investigatory motive does not invalidate it"); *State v. Huisman,* 544 N.W.2d 433 (Iowa 1996) (partial investigatory motive does not invalidate inventory search), the court incorrectly

adopted the state's assertion that the subjective motivation of a police officer conducting an alleged inventory search is "entirely irrelevant." While it is true that the Supreme Court has held that police searches are to be tested "under a standard of objective reasonableness without regard to the underlying intent or motivation of the officers involved," *Scott v. United States,* 436 U.S. 128, 138, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978), the fact remains that the Court in two of *Opperman's* most recent progeny has upheld *inventory* searches only after concluding that police conducting the searches did not act "in bad faith or for the sole purpose of investigation." *See Bertine,* 479 U.S. at 372, 107 S.Ct. at 741; *Florida v. Wells,* 495 U.S. 1, 4, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990) (stating that "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence.")

The Court reiterated the import of such language in *Whren.* In upholding as valid a traffic stop in which narcotics detectives used an objective basis (a violation of minor traffic laws) as a pretext for stopping and then searching persons suspected of drug dealing, the Court noted it would not uphold as valid police attempts to use the objective basis of an inventory search as a pretext for a purely investigatory search. As the Court wrote:

> We are reminded that in *Florida v. Wells* we stated that "an inventory search must not be used as a ruse for a general rummaging in order to discover incriminating evidence;" that in *Colorado v. Bertine,* in approving an inventory search, we apparently thought it significant that there had been "no showing that the police, who were following standard procedures, acted in bad faith or for the sole purpose of investi-

6. Actually, courts must determine the reasonableness of the impoundment prior to determining the reasonableness of the inventory search. *See Fair v. State,* 627 N.E.2d 427, 431 (Ind.1993) (concluding that inventory search was invalid even though impoundment was valid). The trial court in the case at bar found the impoundment to be valid despite finding that the state violated its own procedure in ordering the type of tow ("white tag tow") where an officer remains at the scene until a tow truck arrives. UMPD policy calls for a "white tag tow" only "when it is necessary to immediately remove a vehicle to safeguard the vehicle and its contents (i.e., when

the vehicle is needed for evidence or when the vehicle is creating a traffic hazard)." There was no evidence that the Cutlass was needed for evidence or that it was creating a traffic hazard. As such, UMPD policy required the type of tow where an officer would not have remained at the scene until a tow truck arrived ("red tag tow"). In either case, the UMPD policy provided that the officer who ordered the tow would, prior to removal by the towing service, search the interiors and secured areas of the vehicle. As such, the trial court did not err in concluding that the inventory search followed a valid impoundment.

gation," * * *. In each case we were addressing the validity of a search conducted in the *absence* of probable cause. Our quoted statements simply explain that the exemption from the need for probable cause (and warrant), which is accorded to searches made for the purpose of inventory * * *, is not accorded to searches that are *not* made for those purposes.

*Whren,* 517 U.S. at ――, 116 S.Ct. at 1773 (citations omitted).[7] Under this analysis, we can find the search of the Cutlass to be a reasonable inventory search only if police followed standard procedures in conducting the search, and only if police conducted the search, at least in part, for the purpose of obtaining an inventory. *See Huisman,* 544 N.W.2d at 439–41. Because we find the pretextual issue dispositive, we will not address whether the officer followed standard UMPD procedure in executing the search.

▆▆▆ The Supreme Court has said that searches conducted "in bad faith or for the sole purpose of investigation," are not otherwise valid as inventory searches. *Bertine,* 479 U.S. at 372, 107 S.Ct. at 741. Admittedly, such rules are difficult to administer, but at least one commentator has suggested that faith is "bad" and investigative purpose "sole" only when an inventory search that otherwise would not have occurred is brought about. 3 LaFave, *supra,* § 7.5(d), at 589–90. Under this standard, we must ask whether the police officer in the case at bar would have conducted an "inventory" search had she not first discovered the magazine clip. If the answer is yes, and we conclude that her actions substantially complied with the procedure, then the search was a valid inventory search. But if the answer is no, then her search was not a valid inventory search. *See Huisman,* 544 N.W.2d at 439 (stating that determination whether officers were motivated solely by investigative purpose requires an examination of whether "an administrative reason for the impoundment existed").

The following case is instructive on this point. The Indiana Supreme Court in 1993 invalidated as unreasonable the inventory search of a defendant's car following his arrest for public drunkenness. *Fair v. State,* 627 N.E.2d 427 (Ind.1993). In finding that the police officer's sole purpose in searching the vehicle was investigatory, the court pointed to "several indicia of pretext which raise a question about whether [the search] was conducted in good faith." *Id.* at 436. In particular, the court pointed to the fact that the search was conducted at the scene of the crime, that the search was conducted by an officer responsible for criminal investigations and not the officer responsible for the safekeeping of impounded property, that no formal inventory sheets were completed, that the officer did not make note of the defendant's personal effects, but instead focused only on contraband, and the fact that the car was not actually impounded. *Id.* In conclusion, the court noted that "[w]hile any one of these facts probably would not render the search constitutionally defective, collectively they are very harmful to the State's position." *Id.*

No doubt, the police officer's search in the case at bar was not nearly as defective as the search mentioned above. But the record shows that the search was conducted at the scene of the crime by an officer responsible for criminal investigations, and some time after the parking monitor completed her inventory search. It also is revealing that at no time prior to her search did the police officer ask the monitor if the monitor had conducted an inventory search. Nor did the police officer ask the parking monitor if the monitor needed any help conducting the inventory search. Given the fact that UMPD policy requires the officer ordering the tow to conduct such an inventory search, we can infer that the police officer knew it was the parking monitor's responsibility to immediately inventory the items inside the Cutlass. We also can infer that the police officer had no interest in searching the Cutlass for the

---

7. The state asserts that this language is dicta and does not bind this court. In turn, the state asserts that the standard set in *Rodewald,* namely "that such a motive does not invalidate an inventory search," is applicable and controlling. Re-

spondents' brief at 21, *Holmes,* No. C5–96–901 (citing *Rodewald,* 376 N.W.2d at 421.) It is beyond purview, however, to suggest that either *Bertine* or *Wells* does not bind this court.

purpose of creating an inventory. Such an inference is bolstered by the fact that the state presented no evidence of any formal inventory sheets, or any notation by the police officer regarding any of Holmes' personal effects other than the pistol. From these facts, we find that the officer's sole motivation in conducting the search was to discover the pistol. As such, we hold that the police officer's search was not a valid inventory search, and that the trial court did not err in suppressing evidence of the pistol.

In conclusion, therefore, we hold that the trial court did not err in suppressing evidence of the pistol or Holmes' statements, and consequently reinstate the trial court's order dismissing the charge on the basis of insufficiency of the evidence.

Reversed.