*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1082**

State of Minnesota,
Respondent,

vs.

Patrick Lawrence Zabinski,
Appellant.

**Filed June 8, 2015
Affirmed
Smith, Judge**

Sherburne County District Court
File No. 71-CR-12-918

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Kathleen Heaney, Sherburne County Attorney, Tim Sime, Samuel Wertheimer, II, Assistant County Attorneys, Elk River, Minnesota (for respondent)

Charles A. Ramsay, Daniel J. Koewler, Judson A. Nichols, Ramsay Law Firm, P.L.L.C., Roseville, Minnesota (for appellant)

Considered and decided by Larkin, Presiding Judge; Halbrooks, Judge; and Smith, Judge.

**U N P U B L I S H E D   O P I N I O N**

**SMITH**, Judge

We affirm appellant's convictions of gross-misdemeanor driving while intoxicated because the district court did not err by determining that (1) the traffic stop of appellant

was supported by reasonable suspicion; (2) appellant's consent to urine testing was not unconstitutionally coerced; and (3) the technique used to test appellant's urine conformed to generally accepted chemical-testing practices.

**FACTS**

A 911 caller reported that she saw a semi-trailer truck "with a full load of hay on it" "going northbound in the southbound lane" of a major highway. The caller stated, "Someone needs to help him, somebody's going to get killed." As the caller watched, the semi backed up and proceeded to move in the "right direction." A police officer later identified the source of the call as an auto body shop, and the officer obtained a statement from the 911 caller.

Police dispatch notified a nearby police officer, who then stopped a semi carrying round bales of hay approximately a quarter-mile from the location where the 911 caller had observed the truck traveling on the wrong side of the highway. The officer identified the driver of the semi as appellant Patrick Zabinski. The officer detected the odor of an alcoholic beverage emanating from Zabinski, and he observed that Zabinski's eyes were "bloodshot and watery."

The officer read Zabinksi the Minnesota Commercial Driver's Implied Consent Advisory, informing him that Minnesota law required him to submit to alcohol testing and that "refusal to take the test is a crime;" and he asked if Zabinski would consent to a blood test. After speaking to an attorney, Zabinski agreed to submit to a blood test. The officer transported Zabinski to a hospital, where a blood sample was taken from him

2

using a testing kit provided by the officer. After the blood was drawn, however, the officer noticed that the testing kit was expired.

The officer asked Zabinski if he would consent to a urine test, and Zabinski agreed to provide a urine sample, again using a kit provided by the officer. The officer sent both the blood and the urine samples to the Minnesota Bureau of Criminal Apprehension (BCA). Chemical testing on the urine sample revealed a .16 alcohol concentration.

The state charged Zabinski with three counts of third-degree driving while intoxicated. Zabinski challenged the admission of the urine test, arguing that the officer lacked reasonable suspicion to support a traffic stop, that the implied-consent advisory unconstitutionally coerced Zabinski to provide samples, and that the urine test was unreliable.

Forensic-science expert Thomas Burr testified for the appellant at a district court hearing. Burr stated that he had "reviewed the alcohol test data on this case," particularly "the urine testing data." He stated that when, as here, a urine sample is collected and then sent to the BCA for testing, "[i]t is more important . . . to test it for the presence of glucose and the presence of fermentation." He testified that, when glucose is present in a urine sample and microbes are present, it can "create alcohol" in samples taken from individuals who are "diabetic or have other metabolic problems." Burr stated that it is "a common practice" for labs to test for glucose when testing urine for alcohol concentration. He opined that when, as here, the testing lab does not test for glucose, the test result is not "scientifically valid, reliable and accurate."

Burr acknowledged, however, that the urine-testing kit used by the BCA contains sodium fluoride, a preservative that inhibits "six or eight micro organisms" that can cause glucose in urine to ferment into alcohol. He conceded that the testing method used by the BCA accurately measured alcohol in the urine sample, but opined that "it's not reliable because you need the quality control procedure of glucose testing."

BCA forensic analyst Joseph Yoch testified for the state. Yoch testified that the kit used to test Zabinski's urine sample contained the sodium fluoride preservative. He referenced a scientific study that found that a one-percent sodium fluoride preservative "prevents formation of ethanol in urine samples" and that it is "completely" effective at doing so. He opined that, based on his training and experience, "the vast majority of people are not spilling measureable amounts of glucose into their urine" and that "urine is generally considered sterile when it's in the bladder." Yoch could recall only two instances from his career where fermentation occurred in a urine sample. The first involved a sample that was apple juice rather than urine, and the second was "the nastiest, stinkiest, foulest looking urine [he had] ever uncapped," was "cloudy and discolored," and had been taken from a patient "who had a yeast infection and was a known diabetic." Yoch concluded that, since a urine sample must simultaneously have glucose, microbes, and a lack of sodium fluoride for alcohol to ferment, and since Zabinski's sample "was very clear" and contained "greater than one percent" sodium fluoride, no fermentation had occurred in Zabinski's sample.

The district court denied Zabinski's motion to suppress evidence. It found that "the officer held a reasonable and articulable suspicion [Zabinski] was violating the law"

4

based on the 911 call. It ruled that Zabinski's "urine test results are admissible" because "the administration of the test and the results were foundationally reliable." And it ruled that Zabinski had consented to alcohol testing and that his consent had not been unconstitutionally coerced.

The parties agreed to a stipulated-facts trial under Minn. R. Crim. P. 26.01, subd. 4, and *State v. Lothenbach*, 296 N.W.2d 854 (Minn. 1980). The district court found Zabinski guilty of two counts of driving while intoxicated.

## D E C I S I O N

### I.

Zabinski contends that the officer was not justified in stopping him based on an anonymous tip reporting only a minor traffic offense. Both the federal and state constitutions require that police officers have "a particularized and objective basis for suspecting the particular person stopped of criminal activity" before stopping a vehicle. *State v. Anderson*, 683 N.W.2d 818, 822-23 (Minn. 2004) (quotation omitted). "When considering the justification for an investigatory traffic stop, this court reviews the district court's factual findings for clear error. But we review de novo the legality of an investigatory traffic stop, including whether the officer had a reasonable suspicion for the stop." *Sarber v. Comm'r of Pub. Safety*, 819 N.W.2d 465, 468 (Minn. App. 2012) (citations omitted).

An officer's reasonable basis for conducting a traffic stop need not arise from his personal observations; rather, "[a] factual basis may also be supplied by information acquired from another person, including an informant." *Rose v. Comm'r of Pub. Safety*,

5

637 N.W.2d 326, 328 (Minn. App. 2001), *review denied* (Minn. Mar. 19, 2002). "A private citizen who provides information relevant to the stop is presumed reliable." *Id.* The determination of whether an informant's information is sufficiently reliable to support a traffic stop is therefore "focused on two factors: (1) identifying information provided by the informant; and (2) the facts supporting the informant's assertion that a driver is under the influence." *Id.* But "[n]either factor is separately dispositive, and the determination of whether the officer had a reasonable suspicion of criminal activity at the time of the stop is based on the totality of the circumstances." *Id.*

Zabinski argues that the information provided by the 911 caller was not sufficiently reliable because the caller was anonymous and did not provide information sufficient to suspect that the vehicle the caller observed was driven by an intoxicated driver. "An informant who provides sufficient identifying information is not anonymous, even if the informant does not provide a name." *Id.* Here, the record reflects that the informant was not only identifiable, but was actually identified by police officers, who later took a witness statement. Thus, we conclude that the 911 caller was not anonymous and was reliable.[1] *See, e.g.*, *City of Minnetonka v. Sheperd*, 420 N.W.2d 887, 890 n.1

---

[1] Zabinski argues that this appeal has only "immaterial and cosmetic" differences with his appeal in his implied-consent case arising from the same incident, where a divided panel of this court concluded that the police officer lacked reasonable suspicion to justify stopping Zabinski's truck. *See Zabinski v. Comm'r of Pub. Safety*, No. A13-0957, 2014 WL 2441079 (Minn. App. June 2, 2014). We are not bound by the holdings in Zabinski's implied-consent case. *See State v. Lemmer*, 736 N.W.2d 650, 659-63 (Minn. 2007) (holding that the state is not collaterally estopped in criminal prosecutions from attacking holdings in implied-consent cases because the state was not a party or in privity to any party in implied-consent matters). We therefore independently review the record as it exists now.

6

(Minn. 1988) ("[T]he fact that the police were able to easily find the caller certainly can be used to discredit any argument that the information was not adequate to allow the police to subsequently locate the caller and identify him by name.").

Zabinski primarily focuses, however, on contentions that the 911 caller failed to describe the truck he observed with sufficient detail to justify a stop and that the violation the caller observed was not serious enough to justify an investigatory stop. Although an investigatory traffic stop must not be "the product of mere whim, caprice, or idle curiosity," *State v. Munson*, 594 N.W.2d 128, 136 (Minn. 1999) (quotation omitted), the supreme court has held that an investigatory stop was proper when an officer arrived "within moments" of an offense and stopped a vehicle in a position that was consistent with it being the vehicle used in the offense, even though "the officer did not have any idea what type of automobile was used." *State v. Walker*, 304 Minn. 590, 592, 232 N.W.2d 212, 213-14 (1975). The supreme court has also upheld the validity of an investigatory stop, made shortly after a witness's description, based solely on the vehicle having a similar color to that described by a witness. *See State v. L'Italien*, 355 N.W.2d 709, 709-10 (Minn. 1984). Although Zabinski asserts that the 911 caller's description of a truck carrying hay bales is insufficiently detailed to support an investigatory stop, he

Zabinski's characterization of the record is disingenuous. The outcome in his implied-consent case depended entirely on the fact that "the [911] caller was anonymous." *Zabinski*, 2014 WL 2441079 at *1. Because of that fact, we concluded that "there is no way to determine the reliability of the caller because he or she did not provide any identifying information." *Id.* at *2.

Here, the record contains testimony that the 911 caller was not only identifiable, but was actually identified and that a police officer obtained a statement from the informant. Thus, the record before us differs from that in Zabinski's implied-consent appeal in a crucial way.

cites no authority requiring a more detailed description. Zabinski also does not contend that other trucks were observed nearby carrying hay bales. Since the police officer arrived very shortly after the 911 call and discovered Zabinski's truck carrying hay bales in a location very near where the 911 caller had reported seeing a truck carrying hay bales, we conclude that the officer had a reasonable basis for believing that Zabinski's truck was the one that the caller had described.

Zabinski also contends that the stop was unjustified because the 911 caller did not report any facts giving rise to a suspicion that Zabinski was intoxicated. But a truck turning the wrong way onto a major highway is sufficient to raise a police officer's suspicion that the driver may be impaired regardless of whether the 911 caller stated such a suspicion. *See State v. Diede*, 795 N.W.2d 836, 843 (Minn. 2011) ("The reasonable-suspicion standard [for an investigatory seizure] is not high." (quotation omitted)).

It is also undisputed that the 911 caller reported facts sufficient to raise suspicion that the truck committed a traffic offense. Zabinski cites *State v. Holmes*, 569 N.W.2d 181, 185 (Minn. 1997), to support his contention that a mere "lane violation" is not a serious enough offense to support an investigatory stop. But although *Holmes* acknowledges the view that investigatory stops "should be expressly limited to investigation of serious offenses," *Holmes* held only that parking tickets are insufficiently serious to justify a seizure of a car. *See id.* (quotation omitted). The *Holmes* court in fact specifically distinguished parking tickets from "those routine traffic stops made by police officers who observe a traffic violation," implying the opposite of Zabinski's reading. *See id.* Moreover, although Zabinski characterizes his truck's movement as merely a

8

petty-misdemeanor "lane violation," the 911 caller fretted that "somebody's going to get killed" by the wrong-way movement of his truck on a major highway, indicating much more serious possible characterizations. *See, e.g.*, Minn. Stat. § 169.13, subd. 1 (2010) (defining "reckless driving" as operation of "any vehicle in such a manner as to indicate either a willful or a wanton disregard for the safety of persons or property"). We therefore conclude that the officer had a reasonable basis to stop Zabinski's truck.

## II.

Zabinski argues that his consent to provide a urine sample was unconstitutionally coerced by the threat of incarceration, citing *Bumper v. North Carolina*, 391 U.S. 543, 548-49, 88 S. Ct. 1788, 1792 (1968). Although Zabinski's brief was filed on November 7, 2014, he fails to acknowledge the Minnesota Supreme Court's explicit rejection of this argument more than a year earlier in *State v. Brooks*, 838 N.W.2d 563 (Minn. 2013). In *Brooks*, the supreme court held that notifying a driver that he can be jailed for refusing to submit to chemical testing is not unconstitutional coercion under *Bumper*. *See* 838 N.W.2d at 571. It also noted that "the ability to consult with counsel about an issue supports the conclusion that a defendant made a voluntary decision." *Id.* at 572. Zabinski spoke with an attorney before he consented to chemical testing. We therefore conclude that Zabinski was not unconstitutionally coerced.

## III.

Zabinski challenges the district court's admission of his urine-test result, arguing that the test was not foundationally reliable. A party offering a chemical-test result into evidence "has the burden of establishing a prima facie case that the test is reliable and

that its administration conformed to the procedure necessary to ensure reliability." *Genung v. Comm'r of Pub. Safety*, 589 N.W.2d 311, 313 (Minn. App. 1999) (quotation omitted), *review denied* (Minn. May 18, 1999). Compliance with BCA urine-testing procedures establishes a prima facie case of reliability. *See id.*; *see also State v. Edstrom*, 792 N.W.2d 105, 110 (Minn. App. 2010) (noting that this court has "repeatedly addressed the admissibility of evidence regarding gas headspace chromatography as performed on first-void urine samples"). Once a prima facie case of reliability is established, "[t]he burden of production then shifts to the party opposing admission to show why the test is untrustworthy," but "[t]he burden of persuasion regarding the accuracy of the result remains with the proponent of the evidence." *Genung*, 589 N.W.2d at 313. We review de novo a district court's determination of whether a party proffering chemical testing results has met its burden. *See id.*

Zabinski implicitly concedes that the BCA followed its urine-testing procedures. He therefore implicitly concedes that the state met its burden of establishing a prima facie case of test reliability. He argues, however, that the BCA's test is untrustworthy because it fails to include the additional step of testing for glucose. As support, he proffers Burr's opinion that glucose testing is an important quality-control check to guard against the possibility that urine from individuals who are diabetic or who have other metabolic disorders can ferment, increasing the alcohol concentration within the urine. But Zabinski offers no evidence that he is diabetic or has a metabolic disorder that would cause glucose to be present in his urine, and he does not dispute Yoch's testimony that such cases are exceedingly rare. Since "the admissibility of specific test results in a

10

particular case hinges on the laboratory's compliance with appropriate standards and controls," *State v. Schwartz*, 447 N.W.2d 422, 428 (Minn. 1989), Zabinski's argument that lack of glucose testing might undermine the accuracy of the BCA's urine-testing results in cases involving diabetics or those with metabolic disorders is purely hypothetical and, even if true, does not undermine the admissibility of Zabinski's test result. *See Hager v. Comm'r of Pub. Safety*, 382 N.W.2d 907, 911 (Minn. App. 1986) ("General allegations that test results were affected by a substance, without specific proof, cannot be used to invalidate the test results.")

Zabinski also fails to show that the BCA's existing quality-control mechanism— the use of a preservative that prevents glucose fermentation in urine—is deficient at guarding against inflated alcohol-concentration results even when glucose is present in a urine sample. Burr acknowledged that the preservative was effective at preventing fermentation resulting from "six or eight micro organisms" reacting with glucose in urine, but he opined that the additional step of glucose testing provided superior test reliability, and he indicated that some other laboratories took this additional step. But Burr's preference for an additional quality-control step is just that—a preference. It does not establish that the BCA's use of a preservative to prevent glucose fermentation is foundationally unreliable, either generally or in Zabinski's particular case. Zabinski has therefore failed to meet his burden of production to establish that the BCA's urine-testing procedures are unreliable. We conclude that the district court did not err by finding that Zabinski's urine-test result was foundationally reliable.

**Affirmed.**